1
2
3        •
4
5                        UNITED STATES DISTRICT COURT
6                            DISTRICT OF NEVADA
7                                   * * *
8    REGINALD HOWARD,                    | Case No. 2:11-cv-01402-APG-GWF
9                    Plaintiff,          |
10        v.                             | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
11   BRIAN CONNETT, ET AL.,              |
12                    Defendants.        | (Dkt. Nos. 49, 52.)
13
14

15        Pending before the Court are Defendants' motion for summary judgment and Plaintiff's

16   motion for summary judgment.[1]  (Dkt. Nos. 49, 52.)

17

18   **I.    BACKGROUND**

19        Plaintiff Reginald Howard ("Howard") is an inmate currently housed at Southern Desert

20   Correctional Center ("SDCC"), a facility of the Nevada Department of Corrections ("NDOC").

21   On November 1, 2011, he filed his First Amended Complaint ("FAC") claiming several

22   violations of the U.S. Constitution under 42 U.S.C. § 1983.  (Dkt. No. 4.)[2]  The defendants are

23   various SDCC officials, including several assistant wardens and correctional officers.[3]  Howard

24   _____

25        [1] Plaintiff's motion for summary judgment also serves as his opposition to Defendants' motion for
     summary judgment.  (Dkt. Nos. 52, 54.)

26        [2] The Complaint stated claims sufficient to survive the screening process mandated by 28 U.S.C.
     § 1915A.  (Dkt. No. 3.)
27
          [3] The individual defendants are referred to collectively as "Defendants."  Any official named in
28   this Order is a named defendant unless indicated otherwise.

1  sued each defendant in his or her official capacity for injunctive relief, and in his or her individual
2  capacity for money damages.

3      Howard claims violations of the First Amendment's Free Exercise Clause for not allowing
4  him to properly attend Muslim and/or Nation of Islam services, the Eighth Amendment for cruel
5  and unusual punishment in the form of excessive force and uncivilized conditions of confinement,
6  and the Fourteenth Amendment's Equal Protection and Due Process Clauses. He also claims that
7  his alleged mistreatment is retaliation in violation of the First Amendment because he filed a civil
8  action in this Court in July 2008 for alleged violations of his religious freedoms, 2:08-cv-00728-
9  GMN-GWF. Finally, he claims that at least part of his alleged mistreatment is the result of a
10 conspiracy against him by SDCC officials in violation of 42 U.S.C. § 1985(3).

11     **A.    The Alleged Assault by Officers Lewis and Jones: January 28, 2011**

12     On January 28, 2011 at about 5:00 p.m., SDCC officials reassigned Howard to a
13 dormitory-style housing unit. Howard alleges that he suffered a head injury in a similar prison
14 housing unit in 1979 and that, since then, he has been unable to sleep in dormitory-style units
15 because he gets seizures. He alleges that this information should be in his prison medical files.
16 Howard allegedly filed an emergency grievance explaining this circumstance and requesting
17 transfer instead to Administrative Segregation ("Ad-Seg"). In response, Officer Blake (not a
18 defendant) allegedly told Howard that nothing could be done in response to his grievance because
19 it was late on Friday and prison staff was already gone. Howard allegedly told Officer Blake that
20 he would be unable to sleep in the dorm and that there was nowhere for him to place his prayer
21 rug.[4] Officer Lewis allegedly overheard this conversation and yelled out "f—k your prayers, do
22 you think we care about your prayers?" (FAC at 8.) Howard alleges he then observed another
23 inmate being attacked by Officers Lewis and Jones, who allegedly admitted they thought that that
24 inmate was Howard.

25
26
27
   _____
28     [4] Notably, Howard has not claimed that the physical conditions of the dorm units amount to a
   constitutional violation.

1    It is undisputed that sometime between 6:30 and 7:00 p.m., Officer Lewis ordered Howard

2  against the wall, cuffed him, and escorted him to Disciplinary Segregation ("Dis-Seg"). (*See* Dkt.

3  No. 4 at 7–10; Dkt. No. 49 at 6–7.)  Howard's allegations elaborate that, before going to Dis-Seg,

4  Officers Lewis and Jones physically attacked him by kicking and hitting him.  Howard alleges he

5  told these officers about an old hand injury when they were cuffing him, which he believes they

6  took as a threat.  The officers allegedly threw Howard to the ground and continued hitting and

7  kicking him.  During the ordeal, Officer Jones allegedly yelled that Howard was a "[protected

8  custody] case." (Dkt. No. 4 at 8.)  In all, Howard contends they kicked his sides (about 10 times),

9  lower back, legs, and ankles, and that they hit his ear with an open palm (causing ringing in the

10  ears).  Howard asserts he asked to be taken to the infirmary but that Officer Lewis took him to

11  Dis-Seg instead.  Upon arrival at Dis-Seg, the officer on duty sent Howard to the infirmary.

12    Prison medical records indicate that Howard was examined on January 28, 2011 at 8:05

13  p.m. (Dkt. No. 54 at 40.)[5]  The nurse's notes state, aside from handcuff marks, "no injuries noted

14  at this time" and "stable." (*Id.*)  Howard does not dispute the content of the medical report, but he

15  alleges that Officer Lewis was present and acted to intimidate the nurse into a cursory

16  examination that did not properly document his injuries.  Howard contends that a video camera in

17  the infirmary recorded the examination and that the recording will prove his contentions correct.

18  Howard repeatedly argues that he has not received a copy of this recording in discovery.

19    Unsurprisingly, Defendants' version of the events differs.  Officer Lewis contends that

20  Howard did not comply with instructions to leave the prison's "search and escort" office, where

21  Howard had come to complain about the housing reassignment. (Dkt. No. 49-1 at 98.)  Howard

22  allegedly told the officers to "bring it" when they told him that he would be forcibly removed if

23  he did not leave of his own accord. (*Id.*)  Aside from cuffing Howard to remove him to Dis-Seg,

24  Officer Lewis denies any use of force.  Lewis also denies that he intimidated the nurse during

25  Howard's medical examination. (*Id.*)

26

27
_____

28    [5] Defendants authenticate this record in their sealed submission of Howard's medical records.
(Dkt. No. 48 at 3, 4.)

1   Following the incident, Officer Lewis prepared a "Notice of Charges." (Dkt. No. 54 at

2   29.)[6] Howard was charged with two violations: (1) MJ52, refusal to participate, for refusing his

3   bed reassignment; and (2) MJ25, threats, for verbally threatening Officer Lewis. (*Id.*)

4   Although Howard alleges that both Officers Jones and Lewis attacked him, Defendants'

5   motion and evidence do not purport to explain Officer Jones's role in the incident.

6   **B.   12 Days in Disciplinary Segregation Without Personal Property: January 29,**

7   **2011–February 9, 2011**

8   Immediately following the incident with Officers Lewis and Jones, Howard was placed in

9   Dis-Seg. (*See* Dkt. No. 54 at 29.) It is undisputed that Howard was denied certain items of

10  personal property between January 28, 2011 and February 9, 2011. (Dkt. No. 4 at 13–14; Dkt.

11  No. 49 at 3.) The dispute centers on precisely what items he was not provided. Howard alleges

12  that he was deprived of his personal property, religious items, and legal papers. He contends he

13  was without (i) a change of clothes; (ii) a towel, such that he had to drip dry in a cold cell;

14  (iii) blankets; (iv) personal hygiene supplies; and (v) his Quran. He further contends that he was

15  unable to communicate with his family and with the Court during these 12 days. Howard argues

16  that all of this violated SDCC policy, which, according to Howard, requires that religious and

17  personal property can be held for a maximum of 72 hours and that disciplinary sanctions may not

18  include deprivation of the Bible, the Quran, basic hygiene supplies, state-issued clothing,

19  bedding, or access to the courts.

20  Howard contends that he "personally inform[ed] [Officer] Jaeger, [Officer] Kline, and

21  [Caseworker] Rabourn of the conditions" in Dis-Seg concerning the alleged deprivation of his

22  property. (Dkt. No. 54 at 12.) Howard also contends that the usual SDCC policy is to hold a

23  "classification hearing" within 24 hours of arrival in Dis-Seg as to what property an inmate is

24  allowed, implying that he did not obtain the benefit of this type of hearing. (*Id.* at 14.) However,

25  Howard also alleges that he went to his "due process" hearing on January 31, 2011 and that

26

27  ──────────

28  [6] The Court deems this document authentic for purposes of summary judgment because
    Defendants submitted the same document. (Dkt. No. 49-1 at 52.)

1   Caseworker Rabourn told him that SDCC has a 72-hour policy for personal property. (Dkt. No. 4
2   at 14.)

3        Defendants contend that Howard was not denied the essentials of life, but rather his
4   "personal property," and that any delay was due to problems implementing a new system of
5   processing property to combat contraband in Dis-Seg. (Dkt. No. 49 at 14.)

6        On January 29, 2011, Howard submitted a request for medical services (a "medical kite")
7   in which he complained about being attacked on January 28 and that he still had ringing in his
8   ears. (Dkt. No. 54 at 27; Dkt. No. 48 at 7.) SDCC responded that Howard needed to wait until an
9   appointment was scheduled. (*Id.*)

10       On January 31, 2011, Officer James Teligades (not a defendant) held a hearing concerning
11  the disciplinary charges stemming from the altercation on January 28. (Dkt. No. 54 at 30; Dkt.
12  No. 49-1 at 53.) This hearing appears to have been a type of initial appearance at which Howard
13  pleaded not guilty and Officer Teligades concluded that a disciplinary hearing was warranted.
14  (*See id.*)

15       On February 4, 2011, Howard submitted an emergency grievance concerning the alleged
16  deprivation of his religious and personal property and his legal papers. (Dkt. No. 4 at 14; Dkt.
17  No. 49 at 15.) Officer Jaeger responded by instructing Howard to file a "proper grievance" (Dkt.
18  No. 49-1 at 94) instead of the "improperly filed emergency grievance." (Dkt. No. 49 at 15.) It is
19  unclear what was "improper" about the emergency grievance. Howard alleges that a "return
20  kite," seemingly in response to the emergency grievance, informed him that the "property officer"
21  was Officer R. Kline (not a defendant). (Dkt. No. 4 at 14.)

22       On February 9, 2011, Howard was provided his personal and religious property and his
23  legal papers. (Dkt. No. 4 at 13.) Defendants argue that the delivery of Howard's property
24  coincided with his filing of a "proper" grievance on February 9. (Dkt. No. 49 at 15.)

25       **C.   The Disciplinary Hearing: February 20, 2011**

26       On February 20, 2011, Officer Jaeger held the disciplinary hearing relating to the
27  altercation on January 28. (Dkt. No. 54 at 31; Dkt. No. 49-1 at 55.) It is undisputed that the
28  disciplinary charges were modified from "refusal to participate" and "threats" to "delaying and

1  hindering" and "abusive language." (Dkt No. 54 at 34; Dkt. No. 49-1 at 57.) Howard contends

2  that these modifications amount to new charges without sufficient notice, as they occurred

3  immediately prior to the hearing. Defendants argue that they are simply offense reductions.

4       Howard sought to call Officer Lewis to testify, but Officer Jaeger denied Officer Lewis's

5  testimony on the ground that it was redundant. (Dkt. No. 54 at 31; Dkt. No. 49-1 at 55.) Officer

6  Jaeger also did not permit Howard to present any documentary evidence at the hearing, basing his

7  sentence, at least in part, on an unspecified "officers report." (Dkt. No. 54 at 33; Dkt. No. 49-1 at

8  56.)

9  ### D.   The Alleged Assault by Officer Galvan: April 19, 2011

10       On April 19, 2011, Howard desired to go to the SDCC law library. The parties agree that

11  Howard made three attempts to enter the law library, that he was rejected on the first two

12  attempts, and finally allowed to enter on the third attempt. (Dkt. No. 4 at 15–16; Dkt. No. 49 at

13  18.) The parties disagree, however, about the reasons for the first two denials and about whether

14  Officer Galvan used excessive force against Howard upon Howard's third attempt to enter the

15  library.

16       Howard alleges that at about 12:40 p.m., his unit was released to the yard and to the law

17  library. Officer Galvan allegedly called Howard and another inmate, Jesus Tuero ("Tuero"), over

18  to talk with Galvan. Officer Galvan allegedly said "Do you know who I am?" and released Tuero

19  to go to the law library. Officer Galvan then allegedly forced Howard up against the wall,

20  knocking some of Howard's legal papers to the ground. Howard alleges that Officer Galvan read

21  some of his legal papers and then ordered him back to his cell. Defendants argue that Howard

22  was denied access to the library on this first attempt simply because he tried to go before his

23  approved time slot. (Dkt. No. 49 at 18.)

24       Howard alleges that upon returning to his housing unit he filed an emergency grievance.

25  He alleges that Lt. Orr ordered that Howard be allowed to go to the law library. Officer Galvan

26  allegedly again impeded Howard's access to the law library by hitting him, pushing him against a

27  wall, and ordering him back to the housing unit. Defendants agree that Lt. Orr attempted to

28

1  remedy the situation but that another officer sent Howard back to his cell due to a
2  "miscommunication." (*Id.*)

3       Again, upon returning to his unit, Howard alleges he filed another emergency grievance.
4  Lt. Orr, for the second time, allegedly ordered that Howard be allowed to go the law library.
5  Upon arriving at the law library, Officer Galvan allegedly "threw [Howard's] legal papers away"
6  and pushed Howard up against the wall. Howard alleges his hand was caught on a grill on the
7  wall and that Galvan's attack injured Howard's hand and head. Howard allegedly requested
8  medical treatment, but Officer Galvan told him not to leave the law library for any reason.
9  Howard claims that security cameras in and around the library recorded the altercation between
10 he and Officer Galvan.

11      Upon returning to his cell at about 3:00 p.m. after the law library closed, Howard
12 submitted a medical kite explaining that Officer Galvan had attacked him and that his right hand
13 was injured. (Dkt. No. 54 at 71; Dkt. No. 48 at 11.) This document indicates that an appointment
14 was scheduled two days later on April 21. On May 1, Howard submitted another medical kite for
15 the same injuries. (Dkt. No. 54 at 72; Dkt. No. 48 at 12.) It is unclear why Howard was not seen
16 as scheduled on April 21, but a "late entry" in Howard's medical records on July 8, 2011
17 indicates that Howard was a "no show" at the April 21 appointment. (Dkt. No. 54 at 41; Dkt. No.
18 48 at 5.) Howard alleges he was not seen by medical staff until two weeks after the April 19
19 incident. (Dkt. No. 4 at 16.) Howard's medical records indicate he was seen on May 3, 2011, at
20 which time he refused medical treatment. (Dkt. No. 54 at 79; Dkt. No. 48 at 13.)

21      **E.    Inadequate Religious Services**

22      Howard alleges that since arriving at SDCC in August 2010, services for the Muslim
23 population are below the "bare minimum." (Dkt. No. 4 at 17.) He contends that Nation of Islam
24 ("NOI") services are not held sufficiently often because NDOC does not recognize NOI as a
25 religious group and therefore does not recognize visits from outside NOI sponsors. He alleges
26 that NOI services are monthly while other religions have weekly services. Howard also alleges
27 that he is not being released from his unit for Muslim prayers on Fridays when all other Muslims
28 are released. In the last year, he alleges, he has been allowed to attend about 15 services while

1   other Muslims have attended about 30 services and Christians have been afforded about 50
2   services.

3   **F.     The Conspiracy**

4          Howard alleges a conspiracy to deprive him of medical care as part of a cover up of the
5   excessive force he allegedly suffered on January 28, 2011 and April 19, 2011. (Dkt. No. 4 at 19–
6   20.) He alleges that SDCC policy is to visually inspect all inmates at the 7:30 p.m. count for
7   health and welfare violations (i.e., evidence of a fight), and that his injuries on April 19 were
8   visually apparent yet went unnoticed during the evening count. He also alleges that the two-week
9   delay in obtaining a medical appointment after the April 19 incident shows a conspiracy. He
10  further contends that he asked AWO Dressler to perform an investigation. He alleges that AWO
11  Dressler and Deputy Director Connett, who allegedly investigated the incidents, are part of the
12  conspiracy.

13  **G.     The Order to Produce the Video Footage**

14         The parties filed their respective summary judgment motions in January and February
15  2012. Willis referred to his allegation that there is video footage of his medical examination in
16  January 2011 and of the altercation with Officer Galvan in April 2011 at the law library.  On
17  December 17, 2013, the Court ordered Defendants to either produce that footage or explain why it
18  is unavailable. (Dkt. No. 60.)

19         On January 16, 2014, Defendants responded. (Dkt. No. 61.) Minor Adams ("Adams"), an
20  Associate Warden at SDCC, stated in an affidavit that on the dates in question, no video
21  surveillance cameras were located at the infirmary, or outside or near the law library. Thus, he
22  avers, no video footage was captured that day. (Dkt. No. 61-1 at 2.) Adams states that the only
23  video cameras at SDCC were located in educational areas as requested by the Clark County
24  School District. (*Id.*)

25

26

27

28

1

## II.   ANALYSIS

2

### A.   Legal Standard – Summary Judgment

3   The Federal Rules of Civil Procedure provide for summary adjudication when the
4   pleadings, depositions, answers to interrogatories, and admissions on file, together with the
5   affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is
6   entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those that may
7   affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A
8   dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to
9   return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if
10   reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict
11   in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th
12   Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A
13   principal purpose of summary judgment is "to isolate and dispose of factually unsupported
14   claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

15   In determining summary judgment, a court applies a burden-shifting analysis. "When the
16   party moving for summary judgment would bear the burden of proof at trial, it must come
17   forward with evidence which would entitle it to a directed verdict if the evidence went
18   uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the
19   absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage*
20   *Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast,
21   when the nonmoving party bears the burden of proving the claim or defense, the moving party
22   can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the
23   nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a
24   showing sufficient to establish an element essential to that party's case on which that party will
25   bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323–24. If the moving party fails to
26   meet its initial burden, summary judgment must be denied and the court need not consider the
27   nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

28

1    If the moving party satisfies its initial burden, the burden then shifts to the opposing party

2    to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith*

3    *Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the

4    opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient

5    that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

6    differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

7    F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary

8    judgment by relying solely on conclusory allegations that are unsupported by factual data. *See*

9    *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the

10   assertions and allegations of the pleadings and set forth specific facts by producing competent

11   evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

12   At summary judgment, a court's function is not to weigh the evidence and determine the

13   truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

14   The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in

15   his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not

16   significantly probative, summary judgment may be granted. *See id.* at 249–50.

17   "Courts should construe liberally motion papers and pleadings filed by *pro se* inmates and

18   should avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144,

19   1150 (9th Cir. 2010). In *pro se* prisoner cases, summary judgment is disfavored when discovery

20   requests for relevant evidence are pending. *See Jones v. Blanas*, 393 F.3d 918, 930 (9th Cir.

21   2004) (citing FED. R. CIV. P. 56(f)). "Summary judgment in the face of requests for additional

22   discovery is appropriate only where such discovery would be 'fruitless' with respect to the proof

23   of a viable claim." *Id.*

24   **B.   Legal Standard – 42 U.S.C. § 1983**

25   42 U.S.C. § 1983 provides:

26   Every person who, under color of any statute, ordinance, regulation, custom, or
     usage, of any State or Territory or the District of Columbia, subjects, or causes to
27   be subjected, any citizen of the United States or other person within the
     jurisdiction thereof to the deprivation of any rights, privileges, or immunities
28

secured by the Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for redress ...

Section 1983 provides a mechanism for the private enforcement of substantive rights

conferred by the U.S. Constitution and federal statutes. *Graham v. Connor*, 490 U.S. 386, 393–

94 (1989). Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a

method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266,

271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "To state a claim under

§ 1983, a plaintiff must [1] allege the violation of a right secured by the Constitution and laws of

the United States, and must [2] show that the alleged deprivation was committed by a person

acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

In *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 2101

(2012), the Ninth Circuit "reaffirmed that a plaintiff may state a claim under § 1983 against a

supervisor for deliberate indifference." *Henry A. v. Willden*, 678 F.3d 991, 1003 (9th Cir. 2012).

To be held liable under a theory of deliberate indifference, "the supervisor need not be directly

and personally involved in the same way as are the individual officers who are on the scene

inflicting constitutional injury." *Baca*, 652 F.3d at 1205 (quotation marks and citations omitted).

A § 1983 suit cannot be based on vicarious liability alone, but must allege that the defendant's

own conduct violated the plaintiff's civil rights. *See City of Canton v. Harris*, 489 U.S. 378, 386

(1989).

In § 1983 lawsuits, "supervisors can be held liable for: (1) their own culpable action or

inaction in the training, supervision, or control of subordinates; (2) their acquiescence in the

complained-of constitutional deprivation; and (3) conduct that showed a reckless or callous

indifference to the rights of others." *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000).

In some circumstances a prison official can violate an inmate's rights by failing to

intervene if that failure suggests that the official "'actually wanted the prisoner to suffer the

harm.'" *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (quoting *Del Raine v. Williford*,

32 F.3d 1024, 1038 (7th Cir. 1994)). Similarly, the direct, personal involvement required for

§ 1983 liability is not rigidly controlled by an official's job title or precise responsibilities. *See*

*Holmes v. Kingston*, 2008 WL 4610320 at *3 (E.D. Wis. 2008) ("[G]uards have a duty to

1  intervene if . . . the inmate's conditions of confinement violate the Eighth Amendment. . . . [But]

2  [t]his is not to say that a merely fleeting presence could be enough to satisfy the personal

3  involvement requirement.").

4      ### C.   Personal Capacity and Official Capacity

5      Howard names each individual defendant in his or her personal capacity and official

6  capacity. (Dkt. No. 4 at 2–5.) There is a key distinction between personal- and official-capacity

7  suits. "Personal-capacity suits seek to impose personal liability upon a government official for

8  actions *he* takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)

9  (emphasis supplied). "Official-capacity suits, in contrast, 'generally represent only another way

10  of pleading an action against an entity of which an officer is an agent.'" *Id.* at 165–66 (quoting

11  *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)). "It is *not* a suit

12  against the official personally, for the real party in interest is the entity." *Id.* at 166 (emphasis in

13  original). In an official-capacity suit, the plaintiff must demonstrate that a policy or custom of the

14  governmental entity of which the official was the agent was the moving force behind the

15  violation. *Id.*; *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

16      Here, Howard has not alleged that any policy or custom of the NDOC was related to his

17  constitutional violations. His complaint describes only the individual conduct of the defendants.

18  There appears to be no basis on which the official capacity claims should move forward.

19      Under Rule 56(f)(2), "after giving notice and a reasonable time to respond, the court may

20  . . . grant the [summary judgment] motion on grounds not raised by a party[.]" Because

21  Defendants did not discuss the official-capacity claims in their summary judgment motion, the

22  Court grants each side 30 days from the entry of this Order to respond to the Court's concern

23  about the official-capacity claims. If Howard does not timely respond, the Court will grant

24  summary judgment in Defendants' favor on all of his official-capacity claims.

25

26

27

28

1

### D.    Count One

2      This count concerns the alleged excessive force used by Officers Jones and Lewis on

3   January 28, 2011.

4              1.      **Eighth Amendment: Excessive Force**

5      The Eighth Amendment prohibits prison officials from inflicting cruel and unusual

6   punishment upon prison inmates. *Whitley v. Albers*, 475 U.S. 312, 318–19 (1986).  The key

7   inquiry is not the nature of the inmate's injury, but the reason for inflicting that injury. *Parker v.*

8   *Asher*, 701 F.Supp. 192 (D. Nev. 1988).  When use of excessive force is alleged, the standard is

9   whether the force was applied in a good-faith effort to maintain or restore discipline, or

10  maliciously and sadistically for the sole purpose of causing pain and suffering. *Whitley*, 475 U.S.

11  at 321.  Relevant factors in determining whether force was applied in good faith include the need

12  for the application of force, the relationship between the need and the amount of force used, and

13  the extent of the injury inflicted. *Id.*  Factors of equal importance are the extent of the threat to

14  the safety of staff and inmates, as reasonably perceived by the officers on the basis of facts then

15  known, and efforts made to temper the severity of a forceful response. *Id.*

16     The courts' deference to prison administrators' decisions concerning internal security

17  "extends to a prison security measure taken in response to an actual confrontation with riotous

18  inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of

19  these or any other breaches of prison discipline." *Id.* at 322.  "It does not insulate from review

20  actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury

21  freely substitute their judgment for that of officials who have made a considered choice." *Id.*

22     There are genuine disputes of material fact as to the level of force used during this

23  altercation and whether Officer Lewis interfered with the nurse's performance of his or her duty

24  such that the medical report is tainted.  Howard requested the video footage from the infirmary in

25  his August 13, 2012 "Request for Production of Documents." (*See* Dkt. No. 54 at 119–20.)  In

26  response, Defendants stated that they had provided all of the responsive documents in their initial

27  disclosure. (*Id.* at 121.)  On October 31, 2012, Deputy Attorney General Simon ("DAG Simon"),

28

1   counsel for Defendants, stated in a letter to Howard that he understood that Howard was

2   requesting "any video taken at the prison infirmary." (Dkt. No. 54 at 126.)

3        Defendants now assert that no video footage was captured that day in the infirmary. (Dkt.

4   No. 61-1 at 2.) Even without that footage, however, there is a genuine dispute of material fact.

5   Howard describes the attack in his declaration, and Officer Lewis provides an alternative

6   narrative in his discovery responses. The medical records support Lewis' contentions, but do not

7   establish the absence of a material fact. The competing versions of what transpired, both

8   supported by admissible evidence, require a jury to resolve. *See* FED. R. CIV. P. 56(a).

9                    **2.     First Amendment: Retaliation**

10       "A prisoner suing prison officials under section 1983 for retaliation must allege that he

11  was retaliated against for exercising his constitutional rights and that the retaliatory action does

12  not advance legitimate penological goals, such as preserving institutional order and discipline."

13  *Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir. 1994). "[A] chilling effect on a prisoner's First

14  Amendment right to file prison grievances is sufficient to raise a retaliation claim." *Bruce v. Yist*,

15  351 F.3d 1283, 1288 (9th Cir. 2003).

16       Within the prison context, a viable claim of First Amendment retaliation entails
         five basic elements: (1) An assertion that a state actor took some adverse action
17       against an inmate (2) because of (3) that prisoner's protected conduct, and that
         such action (4) chilled the inmate's exercise of his First Amendment rights, and
18       (5) the action did not reasonably advance a legitimate correctional goal.

19  *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2004).

20       In the FAC, Howard alleges the January 28, 2011 assault was retaliation for his filing a

21  civil rights lawsuit in July 2008. Defendants argue that Howard was sent to segregation because

22  he refused to respond to instructions, not because of his prior suit. This argument is unpersuasive

23  because the relevant issue is the motivation for the alleged assault, not the underlying motivation

24  to send Howard to segregation.

25       Defendants' next argument is convincing, however. They point to the absence of

26  evidence in support of Howard's implied allegation that his speech was chilled. The FAC

27  includes only a bare, conclusory allegation of retaliation without setting forth any facts to support

28  each element of the claim. (Dkt. No. 4 at 10.) Howard's deposition makes equally bare

1   assertions. (Dkt. No. 54 at 37, ¶ 17.) Due to the absence of evidence on this element, no

2   reasonable jury could conclude that Howard's speech was chilled. *See Diaz*, 521 F.3d at 1207.

3   Likewise, there is no evidence to support Howard's claim that the alleged assault was *because of*

4   the prior civil rights lawsuit.

5         In his opposition brief, Howard focuses on a new claim of retaliation—that the alleged

6   January 28, 2011 assault was retaliation for having filed an emergency grievance just moments

7   before the alleged attack. (Dkt. No. 54 at 8–9.) Although the Court must construe Howard's

8   pleadings and moving papers liberally, *Thomas*, 611 F.3d at1150, recognizing this new claim

9   would be a step too far. The FAC alleges retaliation only in connection with the prior lawsuit.

10  Defendants did not thereby have "fair notice" of a claim of retaliation based on the emergency

11  grievance on January 28 nor "the grounds upon which it rest[ed]." *Pickern v. Pier 1 Imports*

12  *(U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (quotation marks and citation omitted).

13        Summary judgment is granted in Defendants' favor as to this retaliation claim.

14        **E.**   **Count Two**

15        This count concerns the disciplinary hearing on February 20, 2011.

16        When an inmate in state custody faces a disciplinary proceeding that may result in the loss

17  of good-time credits or similar infringements on the inmate's liberty interest, procedural due

18  process requires that the inmate receive "(1) advance written notice of the disciplinary charges;

19  (2) an opportunity, when consistent with institutional safety and correctional goals, to call

20  witnesses and present documentary evidence in his defense; and (3) a written statement by the

21  factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent,*

22  *Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454 (1985); *see Wolff v. McDonnell*, 418 U.S. 539, 566

23  (1974). "Prison officials must have the necessary discretion to keep the hearing within reasonable

24  limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as

25  well as to limit access to other inmates to collect statements or to compile other documentary

26  evidence." *Wolff*, 418 U.S. at 566. However, "prison disciplinary committees may not deny a

27  defendant the right to call important witnesses solely for the sake of administrative efficiency."

28  *Bostic v. Carlson*, 884 F.2d 1267, 1273 (9th Cir. 1989). "The prison disciplinary committee has

1  the burden of proving that it had an adequate justification for denying the right to call a witness."

2  *Id.* at 1274.

3      "[T]he requirements of due process are satisfied if some evidence supports the decision by

4  the prison disciplinary board to revoke good time credits. This standard is met if 'there was some

5  evidence from which the conclusion of the administrative tribunal could be deduced . . . .'" *Hill*,

6  472 U.S. at 455 (quoting *United States ex rel. Vajtauer v. Comm'r of Immigration*, 273 U.S. 103,

7  106 (1927)).

8      Howard claims that the modified disciplinary charges violated his Fourteenth Amendment

9  procedural due process rights because he did not receive written notice of the allegedly "new"

10  charges. However, Defendants have put forth evidence indicating that the altered charges were

11  not "new" but rather lessened charges. (Dkt. No. 49-1 at 57; Dkt. No. 49-1 at 93.) Officer Jaeger

12  lessened "refusal to participate" to "delaying and hindering" and "threats" to "abusive language."

13  (Dkt. No. 49-1 at 93.) In response, Howard has not explained how his pre-hearing preparation for

14  the initial charges was insufficient to defend against the lessened charges or how it would have

15  been different. The modified charges did not violate Howard's constitutional right to due

16  process.

17      However, Officer Jaeger abused his discretion in refusing to allow Howard to call Officer

18  Lewis to testify at the hearing. Officer Lewis prepared the "Statement of Charges" against

19  Howard, thus rendering his testimony fundamental to the disciplinary proceedings. The risk of

20  redundancy was minor in comparison to the value of having a first-hand account of what occurred

21  from the correctional officer on scene. There is no indication that having Officer Lewis testify

22  would have posed "undue hazards to institutional safety or correctional goals." *Ponte v. Real*,

23  471 U.S. 491, 497 (1985) (internal quotation marks and citation omitted). If another correctional

24  officer had already testified about the incident from personal involvement, the disallowance of

25  Officer Lewis' testimony as redundant likely would be permissible. *See Bostic*, 884 F.2d at 1273

26  (affirming disallowance of inmate's third witness). But that is not the case here. Howard's

27

28

1   procedural due process rights were violated by the disallowance of Officer Lewis's testimony. [7]

2   *Cf. Jones v. McDaniel*, 552 F. Supp. 2d 1141, 1148 (D. Nev. 2008) ("Where there is a lack of

3   evidence to support a conviction, the hearing officer goes well beyond maintaining 'reasonable

4   limits' on the scope of the hearing when he or she asserts redundance and declines to consider

5   both the testimony of the charging officer and the documentary evidence on which the charges are

6   based.").

7        Officer Jaeger's reliance on the "some evidence" standard is insufficient to justify his

8   refusal to allow documentary evidence. Defendants do not explain why Officer Jaeger refused to

9   allow this evidence other than that "Jaeger clearly had enough evidence to find [Howard] guilty

10  of the charges." (Dkt. No. 49 at 11.) The actual basis for Jaeger's decision is, however, nowhere

11  to be found in Defendants' moving papers or in the submitted, admissible evidence. The record

12  indicates that Officer Jaeger relied, at least in part, upon "the officer's report" to resolve

13  Howard's charges. (Dkt. No. 49-1 at 56.) Officer Lewis prepared the "Statement of Charges,"

14  which includes his narrative of what occurred on January 28, 2011, but it is unclear whether

15  Officer Jaeger relied on Officer Lewis' report or on some other report. The "some evidence"

16  standard should not be equated with "no evidence." *See Hines v. Gomez*, 108 F.3d 265, 268 (9th

17  Cir. 1997). Moreover, Defendants do not explain how Howard's desired presentation of

18  documentary evidence would have created administrative burdens or inefficiencies. Nor do they

19  explain how it would *not* have been "consistent with institutional safety and correctional goals,"

20  *Hill*, 472 U.S. at 454, or how it would have created a risk of reprisal or undermined any prison

21  officials' authority, *Wolff*, 418 U.S. at 566.

22       On a broader level, Defendants' view of the "some evidence" standard creates a scenario

23  that vitiates the due process requirements articulated in *Hill* and *Wolff*. An inmate's

24

25       [7] Defendants' only argument as to the disallowance of Officer Lewis' testimony was that it would

26  have been redundant with his incident report. (Dkt. No. 49 at 2.) The relevant facts are undisputed—that Officer Jaeger disallowed Officer Lewis' testimony on the basis that it would have been redundant.

27  Defendants' argument fails as a matter of law, and there are no facts alleged (let alone supported by any evidence) upon which Defendants could prove there was "an adequate justification for denying

28  [Howard's] right to call [Officer Lewis]." *Bostic*, 884 F.2d at 1273.

1   constitutionally-mandated "opportunity . . . to call witnesses and present documentary evidence in

2   his defense," *Hill*, 472 U.S. at 454, would be near meaningless if a hearing officer could refuse to

3   allow witnesses and documentary evidence once there was "some evidence" in the record against

4   the inmate. If, as here, the correctional officers on scene prepare a written report which forms the

5   basis of the disciplinary charges, that report likely would have "some evidence" of inmate

6   wrongdoing. And it cannot be that once a written incident report is prepared, an inmate loses his

7   or her due process right to the opportunity to present witnesses and documentary evidence.

8       Accordingly, summary judgment is granted in Howard's favor on Count Two against

9   Officer Jaeger as to liability. There are no genuine issues of material fact and Howard is entitled

10  to judgment as a matter of law. FED. R. CIV. P. 56(a). Damages shall be determined at trial.

11      **F.    Count Three**

12      Howard claims that the 12-day deprivation of his personal and religious property and legal

13  papers violated his rights under the First Amendment's Free Exercise Clause, the Eighth

14  Amendment, and the Fourteenth Amendment's Due Process Clause. He also claims that the

15  deprivation was retaliation for filing suit in 2008.

16      Defendants first contend that Howard has not sued the proper parties—that is, "[Howard]

17  cannot establish any of the named Defendants where [*sic*] responsible for processing and

18  providing [Howard] his property." (Dkt. No. 49 at 14.) Defendants admit that Howard filed an

19  emergency grievance with Officer Jaeger, who responded by telling Howard to file a "proper"

20  grievance. (*Id.*) They also admit that he might have made an oral request to Caseworker Rabourn

21  to resolve the situation. In sum, Defendants' argument is that the individual(s) in charge of

22  processing and distributing Howard's property was not aware of the situation. This argument

23  fails.

24      During his time in Dis-Seg, Howard was not in a position to determine precisely which

25  officer was in charge of his property. Even if it is true that Howard learned that Officer Kline

26  was the property officer and that Howard did not specifically grieve to Officer Kline, the officers

27  to whom Howard did directly grieve may be liable. They were personally involved in Howard's

28

1  confinement in Dis-Seg and may have had a duty to intervene regardless of their precise job titles

2  or responsibilities. *See Robins*, 60 F.3d at 1442; *Holmes*, 2008 WL 4610320 at *3.

3      There remains a question of fact about the identity of those to whom Howard grieved,

4  their level of personal involvement with his conditions of confinement, and what steps they took

5  to resolve his grievance(s). To hold otherwise would permit a "non-property" officer to be

6  entirely non-responsive to a segregated prisoner's requests for basic necessities. However, this

7  factual question is material only if Howard's alleged deprivations rise to the level of

8  constitutional violations.

9           **1.    Eighth Amendment: Conditions of Confinement**

10     "To sustain an Eighth Amendment claim, the plaintiff must prove a denial of 'the minimal

11  civilized measure of life's necessities,' . . . occurring through 'deliberate indifference' by prison

12  personnel or officers." *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir.1996) (quoting *Rhodes v.*

13  *Chapman*, 452 U.S. 337, 347(1981); *Wilson v. Seiter*, 501 U.S. 294, 302–03 (1991)). Thus,

14  where a prisoner challenges the conditions of confinement rather than the confinement itself, he

15  must make two showings. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). First, the

16  plaintiff must show the alleged deprivation was "sufficiently serious" to rise to the level of an

17  Eighth Amendment violation. *Id.* Second, the plaintiff must show that the prison official acted

18  with a "sufficiently culpable state of mind," i.e., the official acted with deliberate indifference.

19  *Id.*; *Keenan*, 83 F.3d at 1089.

20     With respect to whether the deprivation was sufficiently serious, "[b]ecause routine

21  discomfort is part of the penalty that criminal offenders pay for their offenses against society,

22  only those deprivations denying the minimal civilized measure of life's necessities are

23  sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*,

24  503 U.S. 1, 9 (1992). "Prison officials have a duty to ensure that prisoners are provided adequate

25  shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson*, 217 F.3d at 731.

26  "The circumstances, nature, and duration of a deprivation of these necessities must be considered

27  in determining whether a constitutional violation has occurred. The more basic the need, the

28  shorter the time it can be withheld." *Id.* (internal quotation marks and citation omitted).

1         Deliberate indifference requires a two-part inquiry.  "First, the inmate must show that the

2    prison officials were aware of a 'substantial risk of serious harm' to an inmate's health or safety.

3    . . . Second, the inmate must show that the prison officials had no 'reasonable' justification for the

4    deprivation, in spite of that risk."  *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)

5    (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 844 (1994)).

6         Defendants argue that the delay in delivering Howard's personal property resulted from

7    new procedures in the property room intended to prevent contraband from entering Dis-Seg.

8    SDCC certainly has a legitimate penological and safety interest in preventing prohibited materials

9    from entering Dis-Seg.  However, Defendants' evidence does not demonstrate that

10   implementation of the new system was the cause of the delay *in this case*.  (Rabourn Decl., Dkt.

11   No. 49-1 at 75–76 ("I was not involved in the distribution of property to inmates in segregation.

12   . . . This new procedure *might have* inadvertently impacted the amount of time it took for

13   [Howard] to receive his personal property in segregation." (emphasis added)); Jaeger Decl., Dkt.

14   No. 49-1 at 94 ("I believe [Howard] had all of the items he was entitled pursuant to procedure,

15   except for any minor delay caused by processing his property in the property room which I would

16   not be involved with.").)

17        More importantly, the deprivation of the basic essentials of life—hygiene supplies,

18   sufficiently warm clothing, a towel to dry after showering if housed in a cold cell—is sufficiently

19   serious that it ripens into a constitutional violation after a very short period of time.  *See Johnson*,

20   217 F.3d at 731.  The deprivation of Howard's other personal property, however, does not amount

21   to an Eighth Amendment violation because it did not deny Howard the "minimal civilized

22   measure of life's necessities" and it lasted for a relatively short period of time.  *Somers*, 109 F.3d

23   at 623.

24        As to deliberate indifference, Howard has sufficiently demonstrated that prison officials

25   were aware of his predicament to establish a genuine issue of material fact.  *See Thomas*, 611

26   F.3d at 1150.  And the implementation of a new property management system does not appear to

27   be a reasonable justification to deprive Howard of the basic necessities.  *See id.*

28

1   Howard's Eighth Amendment claim for unconstitutional conditions of confinement

2   concerning the deprivation of the essentials of life (here: clothing, hygiene supplies, and a towel)

3   survives.  Summary judgment is granted in Defendants' favor for the deprivation of Howard's

4   other property.

5               **2.     First Amendment: Free Exercise Clause**

6        The United States Supreme Court has held that prisoners retain their First Amendment

7   rights, including the right to free exercise of religion.  *O'Lone v. Estate of Shabazz,* 482 U.S. 342,

8   348 (1987).  The Court also has recognized that limitations on a prisoner's free exercise rights

9   arise from both the fact of incarceration and from valid penological objectives.  *Id.*; *McElyea v.*

10  *Babbitt,* 833 F.2d 196, 197 (9th Cir. 1987).  Prison regulations alleged to infringe on the religious

11  exercise right must be evaluated under the "reasonableness" test set forth in *Turner v. Safley,* 482

12  U.S. 78, 89–91 (1987).  *O'Lone,* 482 U.S. at 349; *Freeman v. Arpaio,* 125 F.3d 732, 736 (9th Cir.

13  1997).

14       *Turner* set forth four factors.  First, there must be a valid, rational connection between the

15  prison regulation and the legitimate government interest put forward to justify it, and the

16  governmental objective must itself be a legitimate and neutral one.  A second consideration is

17  whether alternative means of exercising the right on which the regulation impinges remain open

18  to prison inmates.  A third consideration is the impact accommodation of the asserted right will

19  have on guards, other inmates, and the allocation of prison resources.  Finally, the absence of

20  ready alternatives is evidence of the reasonableness of a prison regulation.  *Allen v. Toombs*, 827

21  F.2d 563, 567 (9th Cir. 1987) (citing *Turner*, 482 U.S. at 89–91).

22       Defendants argue that "there is no absolute constitutional restriction on denying an inmate

23  confined to segregation access to the religious items." (Dkt. No. 49 at 17.)  This may be true, but

24  the Court's analysis does not depend on the absence of a black-and-white rule.  Rather, the Court

25  is guided by the *Turner* factors.  First, SDCC has a legitimate, neutral objective in trying to

26  prevent contraband from entering Dis-Seg, and a process that takes more time (within reasonable

27  limits) to properly screen all property going to segregated prisoners is rationally connected to that

28

1  objective. It is unclear, however, whether the new process necessarily requires that the

2  distribution of religious books be delayed to the same degree as other items of personal property.

3  The second factor relies on a factual determination. Howard argues that "[t]he Holy

4  Quran is close to the center of my belief," which the Court liberally construes as a contention that

5  being deprived of the Quran for 12 days significantly impacted Howard's ability to practice his

6  faith.[8] Defendants have not set forth any evidence to indicate that alternative means existed for

7  Howard to practice his faith while in Dis-Seg, and a reasonable jury could decide this issue either

8  way. *See Pierce v. County of Orange*, 526 F.3d 1190, 1209 (9th Cir. 2008) ("[P]lacement in

9  administrative segregation does not, standing alone, justify a complete denial of opportunities to

10  practice religion."). This alone is grounds to deny summary judgment.

11  Moreover, Defendants have not explained how providing a Quran (or a Bible, for that

12  matter) to an inmate in Dis-Seg negatively impacts guards, other inmates, or the allocation of

13  prison resources. Likewise, Defendants have not explained whether any "ready alternatives"

14  existed. *Allen*, 827 F.2d at 567. Indeed, Howard describes an alternative where the first officer to

15  handle inmate property singles out religious books for immediate distribution to inmates in Dis-

16  Seg. (Dkt. No. 54 at 15.)

17  Summary judgment is denied as to this claim.

18  ### 3. Fourteenth Amendment Procedural Due Process: Deprivation of

19  ### Religious Property

20  In *Hudson v. Palmer,* the United States Supreme Court held that intentional deprivation of

21  an inmate's property by prison employees does not violate the Due Process Clause, provided that

22  adequate state post-deprivation remedies are available. 468 U.S. 517 (1984). Nevada law

23  provides for civil actions for the wrongful deprivation of property by state officials. *See* NRS

24  §§ 41.031, 41.0322. To the extent Howard alleges that Defendants deprived him of his religious

25  property without due process of law, Howard may seek redress in the state system. But he cannot

26

27

28  [8] However, Howard must still prove at trial that being deprived of his Quran for 12 days interfered
with the free exercise of his religion.

1   sue in federal court on the claim that the state deprived him of property without due process of the

2   law. *See Schiro v. Clark*, No. 3:10-cv-00203, 2010 WL 4974572 at *4 (D. Nev. 2010).

3       Summary judgment is granted in Defendants' favor as to the claim that the deprivation of

4   religious property violated Howard's Fourteenth Amendment right to procedural due process.

5           **4.   First Amendment: Retaliation**

6       The Court understands Howard's claim to be that the deprivation of property occurred

7   because of his prior lawsuit. (*See* Dkt. No. 4 at 13.)  In their motion, Defendants do not address

8   this retaliation claim at all. (*See* Dkt. No. 49 at 12–17.)  Accordingly, summary judgment on this

9   claim for Defendants is denied. FED. R. CIV. P. 56(a); *see Celotex*, 477 U.S. at 323–24.  Summary

10  judgment for Howard is also denied because there are genuine issues of material fact as to

11  whether Defendants' actions were in retaliation for his prior lawsuit. FED. R. CIV. P. 56(a).

12      **G.   Count Four**

13          **1.   Eighth Amendment: Excessive Force**

14      Defendants state that no video footage exists of the altercation between Howard and

15  Officer Galvan on April 19, 2011. (Dkt. No. 61.)  Nonetheless, there is a genuine issue of

16  material fact as to whether Officer Galvan used excessive force against Howard.  Both sides have

17  submitted admissible evidence, in the form of affidavits, that present starkly differing views of

18  what transpired outside the law library.  Howard submitted three affidavits by fellow inmates:

19  (1) De-John Beals, averring that Howard appeared to be roughed up after returning from the law

20  library (Dkt. No. 54 at 80–81); (2) Marvin Perkins, averring that he personally witnessed Officer

21  Galvan "threaten and physically ruff [*sic*] inmate[] Howard . . . by pushing him on the wall and

22  throwing his legal papers to the ground" (*Id.* at 82–83); and (3) Tyrone Hutchins, averring that he

23  heard Howard hit the grill affixed to the law library's outside window, that Galvan threatened

24  Howard to not leave the law library for any reason, and that Howard appeared to be roughed up

25  when he entered the law library (*Id.* at 84–85).

26      To the contrary, Galvan declares that he does not recall using any force and that if he had,

27  he would have written it up in a report. (Dkt. No. 49-1 at 85.)  This differing view of events,

28  supported by evidence, is sufficient to survive summary judgment.  A reasonable jury, drawing all

1  inferences in Howard's favor, could conclude that Officer Galvan used excessive force. *See* FED.

2  R. CIV. P. 56(a); *Diaz*, 521 F.3d at 1207.  This claim survives.

### 2.    First Amendment: Retaliation

The Court understands Howard's claim to be that the excessive force occurred because of his prior lawsuit. (*See* Dkt. No. 4 at 15–16.)  As with the retaliation claim in Count One, Defendants point to the absence of evidence in support of Howard's implied allegation that his speech was chilled. (Dkt. No. 49 at 18–19.)  The FAC includes only a bare, conclusory allegation of retaliation without setting forth any facts to support each element of the claim. (Dkt. No. 4 at 15–16.)  Due to the absence of evidence on this element, no reasonable jury could conclude that Howard's speech was chilled. *See Diaz*, 521 F.3d at 1207.  Likewise, there is no evidence to support Howard's claim that this alleged assault was *because of* the prior civil rights lawsuit.  Summary judgment is granted in Defendants' favor on this claim.

### H.    Count Five

This count concerns Howard's allegations of insufficient access to religious services.

### 1.    First Amendment: Free Exercise

Defendants merely argue that Chaplain Calderin provided Muslim services in an amount equal to other faiths.  This argument does not address, however, whether Howard was afforded sufficient access to Muslim services such that he could "engag[e] in conduct mandated by his religious faith." *Alvarez v. Hill*, 518 F.3d 1152, 1156 (9th Cir.) (quotation marks and citation omitted).

The testimony by Chaplain Calderin and AWO Burson substantiates the programmed occurrence of weekly Muslim services (both "general" Muslim services and NOI services).  (Dkt. No. 49-1 at 88–90; Dkt. No. 49-1 at 63–64.)  But they do not explain whether and why any of these services was cancelled or whether and why Howard was not allowed to attend.  It may be that Howard's alleged low attendance was due to valid security concerns or to some other legitimate reason, but that information has not been presented to the Court.

Summary judgment of this claim is therefore denied.  There are genuine issues of fact as to the actual quantity of Muslim services available, the quantity that Howard attended, the reasons

1   for any non-attendance, and the importance of attendance for the practice of Howard's religious

2   faith. Genuine issues also remain as to whether there were "ready alternatives" to Muslim and

3   NOI services, and whether accommodating Howard's attendance at weekly services would have

4   negatively impacted guards, other inmates, or the allocation of prison resources. *See Allen*, 827

5   F.2d 563.

### 2.      First Amendment: Retaliation

7           Howard alleges that SDCC officials interfered with the free exercise of his faith *because*

8   *of* his prior lawsuit. (FAC at 18.) As with the retaliation claim in Count Three, Defendants do

9   not challenge this retaliation claim. Therefore, summary judgment for Defendants is denied as to

10  this retaliation claim. FED. R. CIV. P. 56(a); *see Celotex*, 477 U.S. at 323–24.    Summary

11  judgment for Howard is also denied because there are genuine issues of material fact as to

12  whether Defendants' actions were in retaliation for his prior lawsuit. FED. R. CIV. P. 56(a)

### 3.      Fourteenth Amendment: Equal Protection

14          "Prisoners enjoy religious freedom and equal protection of the law subject to restrictions

15  and limitations necessitated by legitimate penological interests." *Freeman v. Arpaio*, 125 F.3d

16  732, 737 (9th Cir. 1997), *overruled on other grounds as recognized by Penwell v. Holtgeerts*, 386

17  F. App'x 665, 667 (9th Cir. 2010) (unpublished). "[P]rison officials cannot discriminate against

18  particular religions." *Id.* (citing *Cruz v. Beto*, 405 U.S. 319, 321–22 (1972) (per curiam)).

19  "Prisons must afford an inmate of a minority religion 'a reasonable opportunity of pursuing his

20  faith comparable to the opportunity afforded fellow prisoners who adhere to conventional

21  religious precepts.'" *Id.* (quoting *Cruz*, 405 U.S. at 322). "Prisons need not provide identical

22  facilities or personnel to different faiths . . . , but must make good faith accommodation of the

23  prisoners' rights in light of practical considerations." *Id.* (quotation marks and citation omitted).

24          "To succeed on an equal protection claim, a plaintiff in a section 1983 claim must show

25  that officials intentionally acted in a discriminatory manner." *Id.* Discriminatory intent can

26  sometimes be inferred by the mere fact of different treatment. *Sischo-Nownejad v. Merced Cmty.*

27  *Coll. Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991). "To defeat summary judgment, therefore,

28  [Howard] 'must set forth specific facts showing that there is a genuine issue' as to whether he was

1  afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths and

2  that such conduct was intentional." *Freeman*, 125 F.3d at 737 (quoting FED. R. CIV. P. 56(a)).

3  Again, Defendants' argument is that Chaplain Calderin provided a nearly equal, if not

4  equal, number of services to all religions. Defendants admit the prior chaplain may have

5  provided fewer Friday Muslim services, but only because he was preparing to leave his job and

6  may have been using up sick time. Therefore, Defendants assert, there is no indication of

7  discriminatory intent. The Court notes first that a chaplain's preparation to leave for a new job is

8  not a legitimate penological interest that would justify cancelling religious services. If services

9  were infrequently provided as Howard alleges, or if he was not allowed to attend, the reasons for

10  the cancellations and disallowals of attendance are not in the record. A reasonable jury could

11  conclude that prison officials had the requisite discriminatory intent based on (i) Stratton's

12  Affidavit [Dkt. #54 at p. 92] alleging fewer Muslim services; (ii) Howard's alleged inability to

13  attend those services; and (iii) the absence of any justification for the disparity, other than generic

14  references to a prisoner's custody level and confinement to segregation that do not refer to

15  Howard in particular. *See Sischo-Nownejad*, 934 F.2d at 1112.

16  Summary judgment is denied as to this Fourteenth Amendment equal protection claim.

17  **I.  Count Six**

18  **1.  Conspiracy: 42 U.S.C. § 1985(3)**

19  A cause of action for conspiracy under § 1985(3) has four elements:

20  (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any
person or class of persons of the equal protection of the laws, or of equal privileges
21  and immunities under the laws; and (3) an act in furtherance of this conspiracy;
(4) whereby a person is either injured in his person or property or deprived of any
22  right or privilege of a citizen of the United States.

23  *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 828–29 (1983). "Further, the

24  second of these four elements requires that in addition to identifying a legally protected right, a

25  plaintiff must demonstrate a deprivation of that right motivated by 'some racial, or perhaps

26  otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Sever*

27  *v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (quoting *Griffin v. Breckenridge*, 403

28  U.S. 88, 102 (1971)). Put another way, plaintiffs under § 1985(3) must "show that they are

1   members of a class that the government has determined 'require[s] and warrant[s] special federal

2   assistance in protecting their rights.'" *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1056

3   (9th Cir. 2002) (quoting *Sever*, 978 F.2d at 1536). As to the fourth element, the "deprivation of

4   federal constitutional rights is a necessary element of the alleged conspiracy." *Giannini v. Real*,

5   911 F.2d 354, 359 (9th Cir. 1990).

6         The rights protected by § 1985(3) are "the right to be free from racial discrimination, the

7   right of interstate travel, and the right to equal protection of the laws." *Life Ins. Co. of N. Am. v.*

8   *Reichardt*, 591 F.2d 499, 503 (9th Cir. 1979) (citing *Griffin*, 403 U.S. at 102–03). "*Griffin* . . .

9   create[d] a cause of action for any tortious interference with a legally-protected right if motivated

10   by the requisite class-based animus[.]" *Id.*

11         Howard does not allege that the conspiracy is based on any class-based animus. Given his

12   other allegations of religious-based animosity and constitutional violations, however, the Court

13   liberally construes the FAC to allege a conspiracy based on religion. *See Thomas*, 611 F.3d at

14   1150.

15                   **a.**    **Religious Animus**

16         The Ninth Circuit has not determined whether violations based on religious animus are

17   within the ambit of § 1985(3). *See Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 524 (9th

18   Cir. 1994). However, the Seventh, Eighth, and Tenth Circuits have expressly held that religious-

19   based animus is actionable under § 1985(3). *Volk v. Coler*, 845 F.2d 1422, 1434 (2d Cir. 1988)

20   ("[Section] 1985 extends beyond conspiracies to discriminate against persons based on race to

21   conspiracies to discriminate against persons based on sex, religion, ethnicity, or political

22   loyalty."); *Taylor v. Gilmartin*, 686 F.2d 1346, 1358 (10th Cir. 1982);[9] *Action v. Gannon*, 450

23   F.2d 1227, 1234 (8th Cir. 1971).

24

25        [9] One year after *Taylor*, the Tenth Circuit held that disabled persons are not protected by
§ 1985(3). *Wilhelm v. Continental Tire Co.*, 720 F.2d 1173, 1176–77 (10th Cir. 1983). The court

26   interpreted the Supreme Court's opinion in *United Brotherhood of Carpenters v. Scott*, which held that
§ 1985(3) did not cover conspiracies motivated by economic, political, or commercial animus:

27          [A]s to the *Scott* opinion, we find nothing therein to give any encouragement whatever to

28          extend § 1985 to classes other than those involved in the strife in the South in 1871 with
       which Congress was then concerned. In fact from *Scott* we get a signal that the classes

1    Several other circuits have implied that religious-based animus is cognizable under

2    § 1985(3) in holding that sex-based animus is so cognizable.  The Second Circuit's language is

3    noteworthy:

> By its very language, § 1985(3) is necessarily tied to evolving notions of equality
> and citizenship.  As conspiracies against women are inherently invidious, and
> repugnant to the notion of equality of rights for all citizens, they are therefore
> encompassed by the Act. . . . A narrow interpretation of the statute as protecting
> only blacks and other analogously oppressed minorities is untenable in light of the
> history of the Act.

8    *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1359 (2d Cir. 1989) (internal quotation

9    marks and citation omitted).  Likewise, conspiracies against religious groups are inherently

10   invidious.  The First Circuit impliedly, and in this Court's view, logically, linked the Equal

11   Protection Clause with the "equal protection of the laws" language of § 1985(3):

> The legislative history of § 1985(3) confirms that even though it was primarily
> motivated by the mob violence directed at the newly emancipated slaves in the
> Reconstruction era, 'its protection extended to all the thirty-eight million citizens
> of this nation.' . . . Moreover, it is logical that, at the very least, the classes
> protected by § 1985(3) must encompass those classifications that merit heightened
> scrutiny under Equal Protection Clause analysis, of which gender is one.

16   *Libertad v. Welch*, 53 F.3d 428, 448–49 (1st Cir. 1995) (quoting *Bray v. Alexandria Women's*

17   *Health Clinic*, 506 U.S. 263, 319 (1993) (Stevens, J., dissenting)); *see also Lyes v. City of Riviera*

18   *Beach, Fla.*, 166 F.3d 1332, 1336 (11th Cir. 1999); *Agarwal v. Regents of Univ. of Minn.*, 788

19   F.2d 504, 510 (8th Cir. 1986).  Like gender, religion is a suspect class that warrants heightened

20   scrutiny for equal protection analysis.  *Ball v. Massanari*, 254 F.3d 817 (9th Cir. 2001).

21   To this Court's knowledge, the Fifth Circuit is the only circuit to expressly hold that

22   § 1985(3) does not cover religious animus.  *Word of Faith World Outreach Center Church, Inc. v.*

23   *Sawyer*, 90 F.3d 118, 124 (5th Cir. 1996).  That court's reasoning was sparse, however.  It relied

24

25

_____

26   covered by § 1985 should not be extended beyond those already expressly provided by
     the Court.

27

28   The Tenth Circuit's holding in *Taylor* still appears to be good law in that circuit, however, as *Wilhelm* did
     not overrule *Taylor*, let alone attempt to distinguish it at all.  *See Wilhelm*, 720 F.2d at 1175–77.

1  on circuit precedent that only racial animus was cognizable under § 1985(3), an antiquated view

2  this Court declines to adopt in light of the overwhelming persuasive authority to the contrary.

3     The Court also notes that several district courts in the Ninth Circuit have determined that

4  § 1985(3) covers religious animus. *See Rankin v. Howard*, 527 F. Supp. 976, 977 (D. Ariz.

5  1981); *Cooper v. Molko*, 512 F. Supp. 563, 569 (N.D. Cal. 1981); *Baer v. Baer*, 450 F. Supp. 481,

6  491 (N.D. Cal. 1978).

7     In short, the Court holds that religious animus is covered by § 1985(3). The next question

8  is whether summary judgment should be granted on Howard's § 1985(3) claim.

9                    **b.    Violation of a Constitutional Right**

10    As noted above, the "deprivation of federal constitutional rights is a necessary element of

11 the alleged conspiracy." *Giannini*, 911 F.2d at 359. Howard claims that as a result of the alleged

12 conspiracy, prison officials were deliberately indifferent to his serious medical needs in violation

13 of the Eighth Amendment. He alleges that they purposely did not notice his obvious injuries

14 during the evening check on April 19, 2011, and that they purposely delayed his requested

15 medical appointment for two weeks, until May 3, 2011. The medical records indicate that

16 Howard requested medical care on April 19 and that he was not seen until May 3, following a

17 second request for care on May 1. (Dkt. No. 48 at 11–13; Dkt. No. 54 at 71, 72, 79.)

18    Defendants' lone argument as to this claim is that there is no evidence that Howard

19 suffered serious medical needs, as required to support a claim for deliberate indifference. (Dkt.

20 No. 49 at 23.) Defendants, however, view the deliberate indifference standard too narrowly. The

21 test for deliberate indifference to medical need is two-pronged:

22        First, the plaintiff must show a serious medical need by demonstrating that failure
          to treat a prisoner's condition could result in further significant injury or the
23        unnecessary and wanton infliction of pain. Second, the plaintiff must show the
          defendant's response to the need was deliberately indifferent.
24

25 *Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks and citation

26 omitted).

27        The existence of an injury that a reasonable doctor or patient would find important
          and worthy of comment or treatment; the presence of a medical condition that
28        significantly affects an individual's daily activities; or the existence of chronic and

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment.

*Id.* at 1059–60.

The second prong, deliberate indifference, requires showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096. "More generally, deliberate indifference may appear when prison officials deny, delay, or intentionally interfere with medical treatment[.]" *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (internal quotation marks and citation omitted). Moreover, the prisoner's harm need not be "substantial" to be actionable. *Id.*

The deliberate indifference doctrine is not unlimited, however. "An inadvertent failure to provide adequate medical care does not, by itself, state a deliberate indifference claim." *Id.* (internal quotation marks and citation omitted). Mere negligence, or a difference in medical opinion, is insufficient. *Id.* Also, delayed care alone is insufficient; there must be some indication of harm flowing from the delay. *See McGuckin*, 974 F.2d at 1060.

Here, as to the first prong, the failure to examine Howard on April 19, 2011 renders it impossible to know whether he had "serious" medical needs that day. He may have been suffering substantial pain from the alleged attack by Officer Galvan. *See McGuckin*, 974 F.2d at 1059–60. Beals' affidavit supports this possibility. (Dkt. No. 54 at 81.) The denial of treatment on April 19 may also amount to the unnecessary and wanton infliction of pain, if the officer(s) on duty knew about the attack, observed his physical condition, and decided not to refer Howard for medical care. These are questions of fact for a jury.

Concerning the second element, there are questions of material fact as to whether the denial of care on April 19, 2011 and the two-week delay were inadvertent or purposeful. Although Howard does not directly allege that he suffered additional harm as a direct result of the delay, a reasonable jury could conclude, based on his second request for care on May 1, 2011, that he needlessly suffered ongoing pain that could have been alleviated with prior medical care.

Howard's Eighth Amendment claim for deliberate indifference for medical care is sufficient to support his § 1985(3) conspiracy claim.

1

### c.    The Conspiracy

2    Defendants have not challenged this aspect of the claim: whether Dressler and Connett

3    (the only two defendants named by Howard in relation to this conspiracy) conspired to deprive

4    Howard of his constitutional rights based on Howard's religion.  Accordingly, summary judgment

5    in Defendants' favor is denied.  The Court also denies summary judgment in Howard's favor

6    because there are genuine issues of material fact as to whether Dressler and Connett conspired

7    against Howard to the extent necessary for liability under § 1985(3). FED. R. CIV. P. 56(a).

8    In summary, the Court denies summary judgment on Howard's § 1985(3) claim.

9
### 2.    First Amendment: Retaliation

10    The Court understands Howard's argument to be that SDCC officials conspired to deny

11    and/or delay medical treatment *because of* his prior lawsuit. (*See* Dkt. No. 4 at 20.)  Defendants

12    do not challenge this retaliation claim.  Therefore, summary judgment for Defendants is denied as

13    to this retaliation claim. FED. R. CIV. P. 56(a); *see Celotex*, 477 U.S. at 323–24.    Summary

14    judgment for Howard is also denied because there are genuine issues of material fact as to

15    whether Defendants' actions were in retaliation for his prior lawsuit. FED. R. CIV. P. 56(a).

16

17  **III.    CONCLUSION**

18    In accord with the above, the Court hereby ORDERS:

19
20    1. All claims against the Clark County Detention Center are DISMISSED WITH PREJUDICE.

21
22
23    2. Both sides may respond within 30 days of the entry of this Order to the Court's concern that the official-capacity claims are unfounded.  If Howard does not timely respond, the Court will grant summary judgment in Defendants' favor on all of his official-capacity claims, under Fed. R. Civ. P. 56(f).

24    3. Summary judgment is DENIED on the Eighth Amendment excessive force claim in Count One.

25
26    4. Summary judgment is GRANTED in Defendants' favor on the First Amendment retaliation claim in Count One.

27    5. Summary judgment is GRANTED in Howard's favor on the Fourteenth Amendment procedural due process claim in Count Two.

28

6. Summary judgment is DENIED on the Eighth Amendment conditions of confinement claim in Count Three, but only as to the deprivation of clothing, hygiene supplies, and a towel. Summary judgment is GRANTED in Defendants' favor on this claim as to Howard's other personal property.

7. Summary judgment is DENIED on the First Amendment free exercise claim in Count Three.

8. Summary judgment is GRANTED in Defendants' favor on the Fourteenth Amendment procedural due process claim in Count Three.

9. Summary judgment is DENIED on the First Amendment retaliation claim in Count Three.

10. Summary judgment is DENIED on the Eighth Amendment excessive force claim in Count Four.

11. Summary judgment is GRANTED in Defendants' favor on the First Amendment retaliation claim in Count Four.

11. Summary judgment is DENIED on the First Amendment free exercise claim in Count Five.

12. Summary judgment is DENIED on the First Amendment retaliation claim in Count Five.

13. Summary judgment is DENIED on the Fourteenth Amendment equal protection claim in Count Five.

14. Summary judgment is DENIED on the 42 U.S.C. § 1985(3) conspiracy claim in Count Six.

15. Summary judgment is DENIED on the First Amendment retaliation claim in Count Six.

DATED this 14th day of February, 2014.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE