UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

REGINALD C. HOWARD,

                       Plaintiff,

     v.

BRIAN CONNETT, et al.,

                     Defendants.

Case No. 2:11-cv-01402-RFB-GWF

**ORDER**

Plaintiff's Motion for Attorney Fees (ECF No. 200)

Defendants' Motion for New Trial (ECF No. 221)

## I.     INTRODUCTION

Before the Court are Defendants' Motion for New Trial (ECF No. 221) and Plaintiff's Motion for Attorney Fees (ECF No. 200). This case arises from various constitutional violations brought under 42 U.S.C. 1983, which occurred to the Plaintiff Reginal C. Howard, while incarcerated at the Southern Desert Correctional Center ("SDCC"). Specifically, Plaintiff's claims relate to First, Eighth, and Fourteenth Amendment violations at the hands of various Defendants, including numerous correctional officers, lieutenants, and the religious adviser. At trial, the Plaintiff advanced eight counts and prevailed on six.

On November 6, 2015, the jury returned a verdict as follows (ECF No. 193):

1.  Count 1

    a.  Count 1: 8th Amendment Excessive Force against Defendant Joseph Lewis: found in favor of Defendant Joseph Lewis.

    b.  Count 1: 8th Amendment Excessive Force against Defendant Jimmy Jones: found in favor of Defendant Jimmy Jones.

2.  Count 2

    a.  Count 2: 14th Amendment Due Process against Defendant Ron Jaeger: the Court found in favor of Plaintiff Howard. The jury awarded $3,000 in compensatory damages and $4,000 in punitive damages.

3.  Count 3

    a.  Count 3: 1st Amendment Free Exercise against Defendant Ron Jaeger: The jury found in favor of Plaintiff Howard and awarded $1000 in compensatory damages and $1000 in punitive damages.

    b.  Count 3: 1st Amendment Free Exercise against Defendant Vincent Raybourn: The Jury found in favor of Plaintiff Howard and awarded $1000 in compensatory damages and $1000 in punitive damages.

4.  Count 4

    a.  Count 4: 8th Amendment Excessive Force against Defendant Rene Galvan: The jury found in favor of Plaintiff Howard and awarded $1000 in compensatory damages and $4000 in punitive damages.

5.  Count 5

    a.  Count 5: 1st Amendment Free Exercise against Defendant Brian Connett: The jury found in favor of Plaintiff Howard and awarded $1000 in compensatory damages and $2,200 in punitive damages.

    b.  Count 5: 1st Amendment Free Exercise against Defendant Julio Calderin: The jury found in favor of Plaintiff Howard and awarded $1000 in compensatory damages and $2,200 in punitive damages.

    c.  Count 5: 14th Amendment Equal Protection against Defendant Brian Connett: The jury found in favor of Plaintiff Howard and awarded $1000 in compensatory damages and $2,200 in punitive damages.

    d.  Count 5: 14th Amendment Equal Protection against Defendant Julio Calderin: The jury found in favor of Plaintiff Howard and awarded $1000 in compensatory damages and $2,200 in punitive damages.

Defendants move for a new trial on every claim and every issue. Defendant state the following as grounds for the motion:

1. Prejudicial misstatements during closing argument by opposing counsel;

2. Cumulative verdicts awarded for same harm under multiple legal theories;

3. Punitive damage awards against the clear weight of the evidence;

4. Error in jury instructions; and

5. Erroneous admission of prejudicial prior bad act evidence

In the alternative, Defendants ask for remittitur.

For the reasons stated below, the Court GRANTS in part and DENIES in part Defendants' Motion (ECF No. 221).

The Court also addresses Plaintiff's Motion for Attorney Fees. ECF No. 200. For the reasons stated below, the Court GRANTS the Motion for Attorney Fees at the rate capped by the Prison Litigation Reform Act ("PLRA").

## II.    DEFENDANTS' MOTION FOR NEW TRIAL, ECF No. 200

### A.  Legal Standard

Pursuant to Fed. R. Civ. P. 59(a), a new trial may be granted in an action in which there has been a trial by jury "for any reason for which a new trial has heretofore been granted in an action at law in federal court." "The grant of a new trial is 'confided almost entirely to the exercise of discretion on the part of the trial court.'" Murphy v. City of Long Beach, 914 F.2d 183, 186 (9th Cir. 1990) (quoting Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980)).

Because "Rule 59 does not specify the grounds on which a motion for a new trial may be granted . . . .[courts] are thus bound by those grounds that have been historically recognized." Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1035 (9th Cir. 2003). Such historical grounds include claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving[.]" Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940); see also Passantino v. Johnson & Johnson Consumer Prods., 212 F.3d 493, 510 n. 15 (9th Cir. 2000). "[E]rroneous jury instructions, as well

as the failure to give adequate instructions, are also bases for a new trial." <u>Murphy</u>, 914 F.2d at 187.

The trial court "is not limited to the grounds a party asserts to justify a new trial, but may sua sponte raise its own concerns about the . . . verdict. Ultimately, the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." <u>Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.</u>, 762 F.3d 829, 842 (9th Cir. 2014) (citations omitted).

## B. Remittitur

"If the amount of damages awarded [by a jury] is excessive, it is the duty of the trial judge to require a remittitur or a new trial." <u>Linn v. United Plant Guard Workers</u>, 383 U.S. 53, 65–66 (1966). "A remittitur must reflect the maximum amount sustainable by the proof." <u>Oracle Corp. v. SAP AG</u>, 765 F.3d 1081, 1094 (9th Cir. 2014) (quotation omitted).

"When the court, after viewing the evidence concerning damages in a light most favorable to the prevailing party, determines that the damages award is excessive, it has two alternatives. It may grant defendant's motion for a new trial or deny the motion conditional upon the prevailing party accepting a remittitur. The prevailing party is given the option of either submitting to a new trial or of accepting a reduced amount of damage which the court considers justified. If the prevailing party does not consent to the reduced amount, a new trial must be granted. If the prevailing party accepts the remittitur, judgment must be entered in the lesser amount." <u>Fenner v. Dependable Trucking Co.</u>, 716 F.2d 598, 603 (9th Cir. 1983).

## C. Discussion

### a. *Prejudicial Statements By Opposing Counsel*

First, Defendants argue that a new trial is warranted because the verdict was unfairly influenced by counsel's multiple improper statements made during closing argument. "The trial court has broad discretion in the control of closing arguments, and this court will not reverse a judgment because of statements made in the arguments of counsel unless they were so prejudicial that a failure to declare a mistrial was an abuse of discretion." <u>People of the Territory of Guam v. Ignacio</u>, 852 F.2d 459, 462 (9th Cir. 1988) (citation omitted). For misconduct in closing arguments

to warrant reversal, it must "so permeate[ ] the trial as to the lead to the conclusion that the jury was necessarily influenced by passion and prejudice in reaching its verdict." <u>Cooper v. Firestone Tire and Rubber Co.</u>, 945 F.2d 1103, 1107 (9th Cir. 1991) (citation omitted). Whether or not the comments were objected to, and whether or not opposing counsel moved for a mistrial, are relevant to the determination of prejudice. <u>See Id.</u> ("The trial court, which is in a far better position to gauge the prejudicial effect of improper comments . . . found it was not [so prejudicial as to merit a new trial] . . . . Most of counsel's comments were not objected to at trial and appellants did not move for a mistrial at the end of the argument.").

### 1. "Golden Rule" Violation

Defendants argue that Plaintiff's counsel violated the "Golden Rule" by asking the jurors to put themselves in Plaintiff's position when he stated "I doubt that any of you have been challenged the way that Mr. Howard has been challenged to protect himself." (Tr. at 20, Nov. 4, 2015.)

The "Golden Rule" to which Defendants refer is used primarily in the context of criminal trials, where prosecutors request a juror to think of themselves in the place of the victim. <u>See Fields v. Woodford</u>, 309 F.3d 1095, 1109 (9th Cir. 2002) <u>as amended</u>, 315 F.3d 1062 (9th Cir. 2002) (quoting <u>Drayden v. White</u>, 232 F.3d 704, 712–13 (9th Cir.2000)) ("In his closing argument, the prosecutor asked the jury to 'think of yourself as Rosemary Janet Cobb' and described the crimes committed against her from her perspective. In doing so '[he] inappropriately obscured the fact that his role is to vindicate the public's interest in punishing crime, not to exact revenge on behalf of an individual victim.'").

Defendants objected to counsel's statement and the Court sustained the objection. However, the Defendants did not at that time nor at any time after seeking an instruction or move for a mistrial.

Plaintiff responds by arguing that the statement was meant to contextualize the actions Plaintiff complained of. Plaintiff argues that Mr. Barrick was merely expressing his doubt that the jurors had ever been in Mr. Howard's position; he was not asking them to place themselves in it

and sympathize with Plaintiff. He appears to have only been emphasizing to jurors that their own life experiences may not be the appropriate frame of reference for evaluating Mr. Howard's actions or credibility. Moreover, the lack of prejudicial impact is reflected by the fact that the jury did not enter judgment against Defendants Lewis and Jones despite Mr. Barrick's statements.

The Court finds that counsel's statement did not clearly violate the Golden Rule. The Court does not find that the portion of the closing argument referenced sought to have the jurors consider a perspective or information that was improper. In fact, the argument here appears to be exactly the opposite to the Golden Rule. The argument appears to merely have pointed out to the jury that the prison setting is *different* than a real world setting in the context of the disputes at issue. This is not an empathy or sympathy argument, rather it is a factual argument about the nature of the circumstances in which the disputed acts occurred. In the context of the entire closing argument by Plaintiff, the Court understood this reference to be asking the jury to remember the prison setting and not rely just upon their common sense applied to a non-prison setting. Indeed, the Defendants themselves often referred, during questioning and closing arguments, to the nature of the prison setting to argue to the jury why the Defendants may have taken the actions they did.

In addition, the Court finds that the jury's split verdict—granting one Eighth amendment claim and denying the other—further undermines Defendants' argument that the statement had a prejudicial effect. See United States v. Drummondo-Farias, 622 F. App'x 616, 618 n.4 (9th Cir. 2015) (citations omitted) ("That the jury in fact rendered a split verdict shows that the jury followed the trial court's instructions.") cert. denied, No. 15-7305, 2016 WL 207387 (U.S. Jan. 19, 2016); see also United States v. Unruh, 855 F.2d 1363, 1374 (9th Cir. 1987) ("The best evidence of the jury's ability to compartmentalize the evidence is its failure to convict all defendants on all counts.") (citation omitted), cert. denied, 488 U.S. 974 (1988).

This finding is consistent with Ninth Circuit declining to find violations from ambiguous characterizations of the jury. The Ninth Circuit has declined to find a violation where counsel stated, "but here you are, this is your lot in life; you are on this particular jury, and you must make some very difficult determinations . . . I have enjoyed representing these people; but my burden . . . is done, almost. And the burden will now shift to you." See Minato v. Scenic Airlines, Inc., 908

F.2d 977, 1990 WL 98855 at *5 (9th Cir. 1990) (unpublished disposition) ("The statement in question did not ask the jurors to step into the shoes of the plaintiffs. Moreover, contrary to Scenic's argument, it is not clear that the statement even suggests that the jurors step into the shoes of the plaintiffs' attorney.").

Additionally, although Defendants' counsel objected, they did not ask for a mistrial. Failure to seek a mistrial is weighs against a determination of prejudice. See Cooper v. Firestone Tire and Rubber Co., 945 F.2d 1103, 1107 (9th Cir. 1991). The Defendants' failure to seek an instruction or request (at the close of the argument) a mistrial speaks to the minimal level of prejudice of a possible misinterpretation of the statements. In other instances, the Defendants did seek limiting instructions as to evidence or arguments, so the Court notes their failure to seek such relief in response to this one allegedly improper sentence in Plaintiff's closing argument. The Court does not find that even a misinterpretation of this sentence by the jury created a sufficient prejudice to justify the ordering of a new trial.

### 2. "Send a Message" Statement

Second, Defendants argue that Plaintiff's counsel improperly told the jury to "send a message" to Defendants when he said: "[Y]ou can decide for yourself whether his denial of witnesses was in good faith or somehow to save the institution money . . . . And, you know, it was wrong. It still is wrong. And it will continue to be wrong, unless you decide to tell him it's wrong and send a message." (Tr. at 8-9, Nov. 4, 2015).

Defendants objected to counsel's use of the phrase "send a message" and the Court sustained the objection. Defendants did not seek a limiting instruction or request a mistrial at the close of the argument.

Plaintiff argues that punitive damages are designed to defer future conduct by a defendant, to, in fact, "send a message," and this was essentially how the Jury was instructed with respect to punitive damages.

The Court notes that "[r]eminding the jury that they have the capacity to deter defendants and others similarly situated is certainly legitimate where punitive damages are at stake." Settlegoode v. Portland Pub. Sch., 371 F.3d 503, 519 (9th Cir. 2004). The Ninth Circuit's model

jury instructions includes the following language with respect to punitive damages: "The purposes of punitive damages are to punish a defendant and to deter similar acts in the future." Instruction 5.5, Ninth Circuit Manual of Model Jury Instructions (2007). "A closing argument that tracks the jury instructions cannot possibly be misconduct." <u>Settlegoode</u>, 371 F.3d at 519; <u>see also</u> <u>Cooper v. Firestone Tire and Rubber Co.</u>, 945 F.2d 1103, 1107 (9th Cir. 1991) (holding that counsel's actions did not rise to the level of misconduct where his closing argument called for "punishment" and to "make sure . . . [defendants] never forget about [the accident]").

The Court does not find that the language used in this argument unfairly prejudiced the Defendants. While the Court did not find and does not find the language to be clearly contrary to the instructions regarding punitive damages, the language could have been confusing to the jury about the appropriate standard. Because of this possible confusion, the Court sustained defendant's objection, and immediately clarified that to the extent the comments could be considered, they could be considered for consideration of punitive damages: "That's correct. There are certain considerations for the damages, and I'll refer you to what you can consider for damages. And, certainly, punitive damages can be awarded in the context of deterring certain types of conduct. And so I will just instruct you to follow those instructions." (Tr. at 9, Nov. 4, 2015). As the phrase was only used once and then the Court explicitly rejected and corrected it as to the standard, the Court does not find that prejudice resulted and certainly not to the extent to warrant a new trial.

The Court also notes that this issue arose in the context of argument regarding punitive damages. The Defendants were presented with an opportunity to bifurcate the trial for purposes of punitive damages. They opposed such a bifurcation.

Finally, the Court notes again that, after the Court's instruction, the Defendants did not seek a mistrial based upon the one-time use of this phrase. Given all of these circumstances, the Court does not find that the Defendants were prejudiced by this phrase and that, even if there was slight confusion, it was addressed by the Court's clarification.

### 3. <u>Facts Not in Evidence</u>

Defendants argue that counsel improperly invited the jury to consider facts not in evidence.

In their Reply, Defendants withdraw this argument, finding that the record does indicate that the facts relied upon were in evidence. (Reply at 4).

4. <u>Reference to Hygiene Items</u>

Defendants claim that Plaintiff's counsel improperly referred to the alleged denial of hygiene items after the Court granted a directed verdict as to the conditions of confinement claim. Counsel then withdrew this line of argument.

Plaintiff argues that the Defendant failed to object to this at the trial and did not request that the Court strike any portion of Mr. Howard's testimony regarding the deprivation of both his hygiene and religious supplies during his stay in the segregation unit—statements given with regards to the 8th amendment claim. Further, Plaintiff argues that the references to denial of hygiene items was in the context of the excessive force claim.

Defendants fail to cite to any binding authority in the Ninth Circuit or Supreme Court that supports its argument. The Eleventh Circuit case Defendants cite is distinguishable. In that case the court granted a new trial after granting qualified immunity to the defendants: "Especially in the light of the district court's preexisting immunity order granting Defendants partial summary judgment, we believe Plaintiff's counsel's closing argument about liability for conduct other than an intentional blow to the head warrants, by itself, a new trial." <u>Christopher v. Florida</u>, 449 F.3d 1360, 1367 (11th Cir. 2006). The Court finds that statements at issue here are insufficient to rise to the Eleventh Circuit's holding that "Plaintiff's counsel's improper closing argument prejudiced the substantial rights of Defendants by taking away from Defendants the benefits of the partial summary judgment they had won before trial and by incorrectly expanding the grounds for liability at trial to include grounds ruled out by the court." <u>Christopher v. Florida</u>, 449 F.3d 1360, 1367 (11th Cir. 2006)

Here, counsel's statements did not expand liability. Rather, they provided context— perhaps unnecessarily, but not detrimentally—as to why the force used against Plaintiff in the remaining 8th Amendment claim, was particularly unnecessary: "But put it in the context of why he was there. He was there to be punished by Lewis, right, for complaining. So he's in the hole 12 days. He testifies, I didn't have soap, toilet paper, towel, change of clothes, any of these things. He

says he's in the same clothes 12 days, right? He says he got toothpaste from another inmate, but not a toothbrush. I digress. Withdraw that line of argument, your Honor." (Tr. at 11, Nov. 4, 2015).

Even if the comments were entirely irrelevant, here again they are not sufficiently prejudicial as to warrant undoing the jury's judgment. It weighs against a finding of prejudice that defendant's counsel did not object, that Plaintiff unilaterally stated that he withdrew the line of argument, and that Defendants' counsel did not move for a mistrial. See Cooper, 945 F.2d at 1107.

### 5. Cumulative Effect

Because the Court does not find that any of the aforementioned arguments regarding counsel's closing arguments rise to the level of necessitating a new trial, the Court does not find any cumulative effect.

#### b. Cumulative Verdicts

Next, Defendants argue that a new trial is warranted due to cumulative verdicts, because the Plaintiff was able to recover under alternative legal theories. Specifically, Defendants argue that as to Count V, the jury returned verdicts against Defendants Calderin and Connett, and assessed identical compensatory and punitive damages on each of two theories of liability: free exercise and equal protection. In support of this argument, Defendants cite to Greenwood Ranches, Inc. v. Skie Const. Co., Inc., 629 F.2d 518, 521 (8th Cir. 1980), standing for the proposition that a plaintiff is not entitled to separate damage awards for each legal theory. Instead, he is entitled only to one damage award if liability is found on any or all of the theories involved. Id.

The Court rejects this argument. Greenwood holds that a plaintiff may not recover for the same harm arising from the same facts under multiple alternative theories. See 629 F.2d at 521 ("Greenwood sought to recover damages flowing essentially from the same transaction . . . for loss and for money expended on the system"). In this instance, Plaintiff alleged two separate causes of action: a First Amendment Free Exercise claim and a Fourteenth Amendment Equal Protection claim. These causes of action have different legal standards requiring different legal elements; have different injuries; and are related to different facts. Plaintiff's First Amendment claim relates to his ability to practice his religion, by restricting Plaintiff's access to Nation of Islam services. Plaintiff's Fourteenth Amendment claim relates to his treatment as a Muslim, as compared to other

prisoners belonging to other religious groups.

The jury instructions further illustrate the different legal elements required for each cause of action. Regarding the First Amendment claim, the parties agreed upon, and the Court provided, the following: "To implicate the Free Exercise Clause of the First Amendment, the plaintiff must show that 1) the prison's regulation substantially burdened a belief that is sincerely held and religious in nature; and 2) that the regulation is not reasonably related to legitimate penological interests." See Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008). Regarding the Fourteenth Amendment claim, the parties agreed upon, and the Court provided, the following: "To state a claim under section 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that: 1) The defendants acted with an intent or purpose to discriminate against the plaintiff 2) based upon membership in a protected class, in this case, a religious group." See Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003).

Finding that Plaintiff's First and Fourteenth Amendment claims are distinct constitutional claims based upon different theories and different factual determinations, the Court rejects Defendants' argument that the claims were essentially alternative theories of recovery and therefore cumulative.

### c. *Punitive Damages Not Supported By Clear Weight of the Evidence*

A plaintiff seeking punitive damages under Section 1983 must present evidence of an "evil motive or . . . reckless indifference to the rights of others." Smith v. Wade, 461 U.S. 30, 46-47 (1983) (citation omitted). The parties did not, nor do they object to the model jury instruction given stating that "[y]ou may award punitive damages only if you find that the defendant's conduct that harmed the plaintiff was malicious, oppressive or in reckless disregard of the plaintiff's rights." Instruction 5.5, Ninth Circuit Manual of Model Jury Instructions (2007).

Defendants argue that a new trial is warranted because the jury's awards of punitive damages were contrary to the clear weight of the evidence with respect to several defendants. Those arguments are addressed in turn.

1. <u>Defendant Rabourn and the Free Exercise Claim in Count III</u>

Defendant Rabourn, a correctional officer, acknowledged that he was present at the

classification hearing that transferred Plaintiff from one cell to another, but emphasized that he had no control over Plaintiff's personal property or the return of his religious items, and that the control of inmate property was generally outside his job duties. In addition, the Court notes that on cross examination, Defendant Rabourn maintained he did not recall dealing with Plaintiff and his property concerns despite records indicating that he responded to Plaintiff's grievances filed on February 7, 2011. (Tr. at 123-124, Oct. 29, 2015).

Mr. Howard testified that Defendant Rabourn was in a position to help him recover his religious items but did nothing to aid him in their recovery. Specifically, Plaintiff testified that he told Defendant Rabourn about his religious items at the classification hearing, that it had been 72 hours, that he hadn't received his property, and that Defendant Rabourn sent no one to retrieve his items. (Tr. at 224-225, Oct. 27, 2015).

Defendants reply that if the jury believed that Defendant Rabourn had control over his possessions, his declining to aid Plaintiff was, at best, negligent.

At oral argument regarding the Motion for New Trial, Plaintiff's counsel conceded that this particular award of punitive damages was supported by the least evidence and that it was a "close call."

 "If the amount of damages awarded [by a jury] is excessive, it is the duty of the trial judge to require a remittitur or a new trial." Linn v. United Plant Guard Workers, 383 U.S. 53, 65–66 (1966). The Court finds that the clear weight of the evidence does not support the award of punitive damages in the amount of $1,000. While Defendant Rabourn may have been in a position to aid Plaintiff in the recovery of his religious items, he was not required to do so. Defendant Rabourn's single interaction with Plaintiff in which he declined to help in the retrieval of religious items, at best, barely established "reckless or callous disregard" as required by law. See Smith v. Wade, 461 U.S. 30, 51 (1983). The Court finds that the fact that the jury awarded punitive damages for Rabourn on only one count further demonstrates their perception of his actions, in comparison to the other defendants.

Therefore the Court remits the amount of punitive damages against Defendant Rabourn from $1,000 to $10.

## 2. Defendant Calderin and the Free Exercise and Equal Protection Claims Presented in Count V

Defendants argue that even if the jury believed that Plaintiff notified Defendant Chaplain Calderin, the spiritual adviser at HDSP who oversaw religious services, that he was missing services and that Defendant Calderin failed to address the problem, this evidence establishes at best negligence. The jury could not have determined that Plaintiff had established by clear and convincing evidence that Defendant Calderin's failure to add Howard to the "call-out list"—the list that enables prisoners to attend services—was malicious, oppressive, or in reckless disregard of Howard's rights.

Mr. Howard testified that he submitted several requests to be placed on the list to attend Islamic services and that he personally handed a written request to Defendant Calderin, the religious supervisor. (Tr. at 27, Oct. 28, 2015; Ex. 30 "Inmate Request Form 4-5-11"; Ex. 45 "Inmate Grievance History"). In addition, Plaintiff testified that Defendant Calderin was on notice of his religious deprivation and was in a position to rectify it but did nothing. Specifically, Calderin came every other week to conduct services but Plaintiff was not being released to attend services because his name was not listed on the call-out list the unit officers used to determine who was allowed to attend these services. (Tr. At 27, Oct. 28, 2015). In addition, the Nation of Islam clerk repeatedly informed Mr. Calderin that one of the members was not allowed to come. (Tr. at 70, Oct. 27, 2015). Nonetheless Defendant Calderin refused to have Plaintiff released. (Tr. at 38-39, Oct. 28, 2015).

Defendant Calderin himself testified that if he knew an inmate was complaining about not making it to services, he "could do something about it." (Tr. at 76, Nov. 4, 2015). While Defendant Calderin maintained that he never knew about Plaintiff's grievances, he was presented with a document (Ex. 45) of Plaintiff's grievances where multiple grievances regarding religious services were specifically directed to Calderin. (Tr. at 88-89, Nov. 4, 2015).

Last, Plaintiff's counsel produced Ex. 46 to Defendant Calderin. The exhibit clearly indicates that he denied Plaintiff's grievance regarding religious services. (Tr. at 90-91, Nov. 4, 2015). In this report dated April 4, 2011, Defendant Calderin stated "inmate has attended Humah

for the last four weeks and has not been denied access to the chapel." (Ex. 46). Defendant Calderin then admitted at the trial that he had "no records upon which to base [his] answer." (Tr. at 90-91, Nov. 4, 2015). In other words, Defendant Calderin recklessly yet unequivocally **lied** in an official grievance report that Plaintiff had not been denied access to religious services despite lacking any information to suggest that this was true. Defendant Calderin admitted on the stand to fabricating statements during the grievance process. "Q: So when you signed this document (Ex. 46, Def.'s declining of Pl.'s grievance), you had no records upon which to base your answer, right? . . . A: No." (Tr. at 90-91, Nov. 4, 2015). The Court therefore finds that the jury could draw the inference that he fabricated this statement, and did so out of malice or with obvious reckless disregard to known violations of Mr. Howard's rights.

The Court finds that the clear weight of the evidence indicated a basis for punitive damages against Defendant Calderin. Given his position as a spiritual adviser in the prison, his refusal to acknowledge his role in Plaintiff's access to religious services, and knowing misrepresentations made in the grievance process which resulted in the denial of Plaintiff's access to religious service, the Court finds that there was a clear basis for finding that Defendant Calderin acted in a malicious, oppressive, or reckless disregard of Plaintiff's religious rights. All of this evidence from the trial supports the jury's verdict that Calderin personally and oppressively participated in the deprivation of Howard's rights.

Further, the Court finds that Defendant Calderin's demeanor when he took the stand to further support an award of punitive damages. His nonchalance about lying in an official report, his apparent indifference to his actions, and his anger for having to respond to Plaintiff's claims could have provided an additional basis for finding that his behavior in repeatedly denying Plaintiff's requests was malicious, oppressive, or in reckless disregard of Plaintiff's religious rights.

The Court therefore declines to vacate or remit the punitive damages against Defendant Calderin.

3. <u>Defendant Connett, and the Free Exercise and Equal Protection Claims Presented in Count V</u>

Defendants argue that the evidence does not establish that Defendant Connett, a deputy director at the prison, was responsible for Plaintiff's inability to attend Nation of Islam services, or that he denied Plaintiff access to the services out of ill will or complete indifference to Plaintiff's rights. (Tr. at 30-31, Oct. 28, 2015). Further, Defendants argue that Plaintiff's exhibits confirm that it was Deputy Director Foster, not Defendant Connett, who provided a second-level response to Plaintiff's grievance related to the Nation of Islam services. (Tr. at 25, Oct. 28, 2015).

Plaintiff argues that Mr. Howard testified that he submitted grievances that were responded to by Defendant Connett regarding deprivation of religious services. (Tr. at 30-31, Oct. 28, 2015). Accordingly, Defendant Connett was on notice of his religious deprivation and was in a position to rectify it. (Tr. at 39, Oct. 28, 2015). In addition, Defendant Connett testified that he received and reviewed multiple grievances from Plaintiff during the period of time that he reviewed grievances. (Tr. at 37, 39-50, Nov. 4, 2015). These grievances included complaints associated with Plaintiff's inability to access services. (Tr. at 37, 39-50, Nov. 4, 2015). However, although Defendant Connett had the ability and the authority to investigate these grievances, he did not do so. (Tr. at 48-50, Nov. 4, 2015). Connett also did not even inquire as to whether or not the issues or grievances were in fact ever investigated or resolved.

The Court has reviewed the transcript and Ex. 45, "Inmate Grievance History," and finds that Plaintiff's grievance filed on July 18, 2011 was specifically assigned to Brian Connett. The comments related to this grievance note: "I was not allow to attend Friday prayer for the week of July 1st and July 'th [sic], 2011.' This has became a continue [sic] practice from May 27, 2011 and June 3, 2011. But other Muslims are been allowed." (Ex. 45). Based on the testimony noted above and a review of this Exhibit, the Court finds that there was testimony to support Connett's review of Howard's grievances regarding his inability to worship and access to religious services. Thus, there was evidence to support Connett's ratification of the deprivation of rights of Howard. This evidence supports the jury's punitive damages award as to the Free Exercise claim. The Court also notes again Connett's apparent demeanor of indifference even at trial as to Howard's rights further supports this award. Connett's demeanor could easily have led the jury to understand that he was disdainful of having to respond to an inmate and offended at having to appear at trial to

defend his actions.

However, the Court does find the punitive damages award against Connett for the Equal Protection claim in Count V to be excessive. There was not as substantial or significant evidence presented of Connett's knowledge about a varied or different treatment of Howard based upon his membership in a religious group. While there was clear evidence of the issue of Howard not being able to worship as a Muslim presented to and ignored by Connett, there was not similarly clear evidence with respect to the issue of discriminatory or different treatment of Howard due to his religion. Therefore, the Court remits the punitive damages award on the equal protection claim in Count V from $2,200 to $50.

### 4. Defendant Jaeger and the Due Process Claim in Count II and the Free Exercise Claim in Count III

#### a. Count II

As to Count II, the Court had previously ruled in favor of Plaintiff on summary judgment. Therefore the only question was the damages to be awarded. Defendants argue that Plaintiff testified only that Defendant Jaeger denied his request to call Officer Lewis at the disciplinary hearing because Defendant Jaeger had already decided to reduce the charges. Therefore, there was no indication of ill will or indifference to Plaintiff's rights.

Plaintiff argues that, on the contrary, Defendant Jaeger denied Plaintiff's ability to call witnesses at his disciplinary hearing merely because he had the authority to do so. (Tr. at 112:5-19, Oct. 28, 2015). The Court agrees, and finds that Defendant Jaeger testified to this belief that he was given great discretion by the disciplinary manual to determine which witnesses were permitted to testify. Specifically, Jaeger's testimony reflects his belief that he had the authority, and in turn exercised it, to deny prisoners such as Plaintiff their right to call witnesses merely because he believed in some instances that it would be unnecessary or duplicative of their prior statements to do so. (Tr. at 112-13, Oct. 28, 2015). A: "I find [my decision not to allow Plaintiff to call a witness] fair because I'm given that authority by our -- AR 707.1 in the disciplinary manual gives me the authority to determine what witnesses and what statements I should take." (Id. at 112:16-19). In fact, at sidebar immediately following his testimony, the Court and parties

discussed the potential ramifications of Jaeger's testimony, including a limiting instruction: "THE COURT: … what he said is actually not true legally. He cannot—he doesn't have the authority under any regulation to deny someone their constitutional rights." (Tr. at 119, Oct. 28, 2015).

Therefore the Court finds that the clear weight of the evidence provided the basis for a reasonable jury to find that, at a minimum, Jaeger acted with reckless disregard for plaintiff's due process rights, and therefore lawfully awarded punitive damages as to Count II against Defendant Jaeger.

### b. Count III

As to Count III, Defendants argue that Plaintiff acknowledged receiving his religious items within days and provided no evidence indicating that his health or safety was at risk due to the short delay associated with the return of his personal property.

Defendants appear to have confused the legal standard associated with a First Amendment free exercise claim. Proving such a claim does not require that a plaintiff show that his health or safety was at risk. See, e.g., Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008) (To implicate the Free Exercise Clause of the First Amendment, the plaintiff must show that 1) the prison's regulation substantially burdened a belief that is sincerely held and religious in nature; and 2) that the regulation is not reasonably related to legitimate penological interests.).

Plaintiff testified that he was not permitted to have his Qur'an and other religious books for twelve days. (Tr. 215-16, Oct. 27, 2015). He testified that he told Jaeger personally that he was missing the Qu'ran and other religious texts; that he filed an emergency grievance with regard to his items; and that Jaeger responded in writing that the grievance was not an emergency, without providing any further explanation. (Tr. At 218, Oct. 27, 2015); (Pl's Ex. 17). His explanation stated that Plaintiff should "utilize the proper grievance procedures." (Id.) Plaintiff testified that the alternative procedure, a "regular grievance" could take 30 to 45 days to receive a response. (Tr. At 220, Oct. 27, 2015). Plaintiff thus provided evidence that his sincerely held religious belief was substantially burdened by confiscation of his faith's holy book and other religious texts, and presented evidence that Jaeger would have knowingly allowed that burden to persist for thirty days or more. Defendants did not present evidence that the twelve-day confiscation was reasonably

related to a legitimate penological interest. The Court finds that the clear weight of the evidence provided a basis for the jury to decide that Jaeger acted with deliberate or reckless disregard for Plaintiff's free exercise rights. Therefore the Court rejects Defendants' argument that there was no reasonable basis for punitive damages against Defendant Jaeger as to Count III.

The Court therefore declines to vacate or remit the punitive damages against Defendant Jaeger.

### d. Instructional Error

Defendants argue that the removal of the deference language from the excessive force instruction was error and prejudiced Defendants.

The instruction reads as follows: "you should give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security in a prison."

Defendants argue that given that the parties presented fundamentally different versions of the April 2011 confrontation and that Defendant Galvan presented evidence of Plaintiff's threatening behavior, the evidence strongly indicates that Defendants were prejudiced by the removal of the deference language from the excessive force instruction. Defendants cite <u>Wood v. Beauclair</u>, 692 F.3d 1041, 1049-50 (9th Cir. 2012) to allege a "requirement to accord deference to prison officials when using force." Def.'s Mot. for a New Trial at 15.

Plaintiff argues that because the Jury found in favor of Defendants Lewis and Jones on the first Excessive Force claim, the Defendants' arguments lack merit. Further, regarding the <u>Wood</u> decision, the rationale for such deference arises only where there is a "need to maintain or restore discipline inside the prison." <u>Wood v. Beauclair</u>, 692 F.3d 1049 (9th Cir. 2012) (citation omitted). Here, Defendant Galvan testified that he felt no physical threat. He further testified that he felt no particular threat at all. (Tr. at 85:18 - 87:15, Oct. 29, 2015). Thus, there was no "need to maintain or restore order." Defendant Galvan did not testify that he was not implementing any NDOC policy and the jury was entitled to consider whether he acted "maliciously and with the intent to inflict harm" without granting him any deference at all.

As an initial matter, the Court finds that the instruction Defendants requested *was in fact*

*read aloud to the jury* before the Court considered Plaintiff's motion to remove the deferential language in the jury instruction. This is to say that the oral instruction to the jury included the deference language but the written instructions sent back to them did not include this language.

Further, having reviewed the instruction, the Court finds that the instruction does not apply in this case. The deferential instruction by its terms applies where the Defendants are arguing that their behavior was justified by the adoption or execution of a policy or practice. Galvan *did not testify* that he was implementing a particular policy or following a specific protocol. He was acting on his discretion and judgment. As stated in <u>Wood</u>, "[w]here there is no legitimate penological purpose for a prison official's conduct, courts have presume[ed] malicious and sadistic intent." 692 F.3d at 1050 (alteration in original) (citation omitted). Throughout the entirety of this action, Defendants have never argued with respect to the Eighth Amendment causes of action that they acted pursuant to a particular prison policy or protocol. To the extent Defendants are arguing this, the Court finds that the Defendants would have been required to present this specific defense well before the issuance of jury instructions, so that the Plaintiff could have notice of such a defense and the opportunity to rebut this defense by arguing, for example, that the policy itself was unconstitutional. Rather, Defendants appear to suggest that their individual judgment, including the use of force, should be given *de facto* deference without reference to a penological interest. However, by this logic, all uses of force would need to be deferred to, regardless of penological interest. The Ninth Circuit has rejected such blanket deference. <u>See</u> <u>Wood</u>, 692 F.3d at 1050. In order for deference to apply, the prison officials must connect their actions to a policy or penological interest which could then be challenged by the Plaintiff.

The Court further finds that the jury's split verdict, in granting for the Plaintiff on one excessive force claim and for the Defendants on another, undermines Defendants' argument that the instruction was prejudicial to them. <u>See</u> <u>United States v. Drummondo-Farias</u>, 622 F. App'x 616, 618 n.4 (9th Cir. 2015) (citations omitted) ("We note also that the district court instructed the jury to consider the charges separately, diminishing the risk of prejudice. . . . That the jury in fact rendered a split verdict shows that the jury followed the trial court's instructions.") <u>cert. denied</u>, No. 15-7305, 2016 WL 207387 (U.S. Jan. 19, 2016); <u>see also</u> <u>United States v. Unruh</u>, 855 F.2d

1363, 1374 (9th Cir. 1987) ("The best evidence of the jury's ability to compartmentalize the evidence is its failure to convict all defendants on all counts."), <u>cert. denied</u>, 488 U.S. 974 (1988).

Therefore the Court denies the motion on this ground.

### e. *Prejudicial Bad Act Evidence*

The Court allowed Plaintiff to recall Defendant Jaeger over Defendants' objection and examine him with respect to other instances in which Defendant Jaeger had denied inmate requests for witnesses at disciplinary hearings in his role as a hearing officer. (Tr. at 146, Nov. 4, 2015). Then, the Court denied Defendants' request that the limiting instruction be provided to the jury in written form. (Tr. at 42-43, 74, Nov. 5, 2015).

The Defendants argue that a new trial is warranted due to the admission of prejudicial testimony of Defendant Jaeger regarding prior instances with other inmates in which he denied requests for witnesses in his capacity as a hearing officer. The Defendants further argue that the jury did not have the benefit of a trial transcript, and that the Court's statement that "it is a violation of due process for Mr. Howard to have been denied witnesses at the proceeding at all," and "there is nothing that this witness can say that would in any way and can in any way change that finding" confused the jury and led it to place undue weight on the bad act evidence.

The Court rejects this argument. Relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice. Fed. R. of Evid. 403. "Unfairly prejudicial evidence is that having "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." <u>U.S. v. Gonzalez-Florez</u>, 418 F.3d 1093, 1098 (9th Cir. 2005) (citation omitted). A district "court's evidentiary rulings are reviewed for abuse of discretion and will not be reversed absent prejudice to the party whose evidence was excluded." <u>Glover v. BIC Corp.</u>, 6 F.3d 1318, 1328 (9th Cir. 1993).

As a preliminary matter, the Court does not find that the Court's statements had or compounded any prejudicial effect. The first allegedly prejudicial statement made by the Court is the summary of the legal standard for due process claims relevant to Defendant Jaeger. The second statement was appropriate where summary judgment has already been found for Defendant Jaeger. The Court finds that rather than confusing the jury, these instructions were necessary to clarify

Defendant Jaeger's actions and the impact the Court's prior ruling had on the proceedings going forward. In fact, this possibility was expressly discussed at sidebar during Jaeger's testimony because Jaeger had in fact misstated the law and his culpability. As previously discussed, the Court and parties discussed the potential ramifications of Jaeger's testimony, including a limiting instruction: "THE COURT: … what he said is actually not true legally. He cannot—he doesn't have the authority under any regulation to deny someone their constitutional rights." (Tr. at 119, Oct. 28, 2015). Therefore, the instruction was necessary to mitigate any effect Jaeger's erroneous testimony justifying his actions may have had on the jury's consideration of punitive damages for the due process violation.

Defendants also argue that the evidence regarding Defendant Jaeger's prior actions was not disclosed during discovery and placed Plaintiff at an unfair advantage at trial, since the Court ordered Defendants produce it only after the trial began. Defendants argue that this required Defendants to respond to a discovery request during trial, resulting in a significant burden and distraction during the critical phase of trial.

The Defendants cite to no legal authority that damaging evidence revealed during the trial should be categorically precluded. Further, Defendants cite to no authority suggesting that the inconvenience of complying with a Court order—in this case, a discovery-related order—unduly prejudices the opposing side such that the evidence produced should be excluded. The Court requested the documents in question to be filed under seal on the first day of the trial. (Tr. at 10-11, Oct. 26, 2015). At no point did Defendants request a continuance in order to produce these documents. In fact, Defendants in their Motion for New Trial fail to explain what if any action they would have taken or done differently, had they had more time to do so.

As to the prejudicial effect of the evidence itself, Plaintiff also points out that in order to recover punitive damages, the §1983 plaintiff must show defendant's "evil motive or . . . reckless indifference to the rights of others." Smith v. Wade, 461 U.S. 30, 46-47 (1983). Accordingly, one way for Mr. Howard to recover punitive damages against Defendant Jaeger was to introduce the pattern of conduct evidence that the Court allowed.

The Court finds that the information regarding Defendant Jaeger's prior bad acts associated

with his refusal to allow prisoners to bring witnesses in their proceedings was not unduly prejudicial but rather crucial in the Plaintiff's ability to prove punitive damages on his Fourteenth Amendment cause of action. While the information required to do so was disclosed perhaps later than the Defendants, and indeed the Plaintiff, may have preferred, neither its introduction nor the requirement that Defendants produce the information was unduly prejudicial.

Furthermore, the parties specifically addressed the possibility of bifurcating the trial at the outset as to punitive damages, given the prior bad acts alleged by Defendants. While Plaintiff's counsel requested bifurcation, Defendants expressly opposed it.

"THE COURT: So I guess my first question is this then. Are you moving to bifurcate this trial as it relates to punitive damages?

MR. BARRICK: Yes, Your Honor.

THE COURT: Okay. Ms. Menendez? Mr. Frost?

MS. MENENDEZ: Obviously, we disagree with it because we want to go forward."

(Tr. at 10, Oct. 26, 2015).

Therefore, the Defendants had the possibility of bifurcating the trial—an option that opposing counsel requested and supported—for the purpose of isolating the prior bad acts as evidence in support of punitive damages, but they specifically opposed bifurcation from the beginning. A district "court's evidentiary rulings are reviewed for abuse of discretion and will not be reversed absent prejudice to the party whose evidence was excluded." Glover v. BIC Corp., 6 F.3d 1318, 1328 (9th Cir. 1993). Just as failure to move for a mistrial weighs against a determination of prejudicial effect of statements in closing argument, see Cooper, 945 F.2d at 1107, opposition to the mitigating procedure of bifurcation may weigh against declining to find sufficient prejudice to merit undoing the jury's judgment on grounds of prejudicial evidence. Yet even if Defendants had not opposed bifurcation, the Court finds that the prejudicial effect of the evidence did not substantially outweigh its probative value, and thus it was properly admitted.

The Court therefore declines to grant a motion for new trial based on the prior bad act evidence admitted.

### III.    MOTION FOR ATTORNEY FEES, ECF NO. 200

42 U.S.C. §1997e(d)(2)-(3) of the PLRA provides: "Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant. No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 20006A of Title 18, United States Code, for payment of court-appointed counsel." The Ninth Circuit has found that the PLRA caps on attorney's fees are constitutional. Madrid v. Gomez, 190 F.3d 990, 995-996 (9th Cir. 1999). The current Criminal Justice Act's ("CJA") maximum compensation rate is $127. This means the maximum hourly rate Plaintiff's counsel can claim is $190.50 (which is 150% of $127.00).

The Ninth Circuit has defined the contours of the PLRA and the cap on attorney fees as follows: "[T]he cap in § (d)(2) does not apply to fees incurred on appeal by a prisoner who successfully defends the verdict that he obtained in the district court. In other words, the § (d)(2) cap applies only to fees incurred in *securing the judgment* in the district court and not to fees incurred in defending the judgment on appeal." Woods v. Carey, 722 F.3d 1177, 1179 (9th Cir. 2013) (emphasis added).

The parties agree that the PLRA cap applies to fees incurred to this point, where judgment has not been entered and the Defendants have not yet appealed the judgment. The Court therefore finds that the maximum hourly rate for Plaintiff's counsel is $190.50.

Turning to the specific fees incurred, the Court also finds that Plaintiff's fees for both counsel and his legal assistant are not duplicative, because the nature of the work done by counsel and legal assistants is distinct. The Court incorporates its reasoning laid out in the hearing on December, 14, 2015, and elaborates below, addressing the individual objections at this time regarding billing for Plaintiff's counsel.

### A.  11/6/2015 – 9.20 Hours

The parties were told to report to Court by 9:00 a.m. on November 6, 2015. (Tr. at 94-95, Nov. 4, 2015). Counsel was excused by the court by 2:10p.m.; thereby making the maximum time at court related to the case approximately 5 hours.

Plaintiff argues that the entry for 9.20 hours accounts not only for being in trial but also for debriefing with Plaintiff's legal assistant and a volunteer from Legal Aid.

Defendants argue that any conversations could have easily taken place while waiting for the jury to deliberate and that amount should be cut to the time actually spent in court, taking into account traveling back and forth. The Court should award no more than 7 hours for this entry.

Having verified the time of adjournment on November 6, 2015, The Court grants reduction of the hours to 6.2 hours.

**B.  11/3/2015 – 4.40 Hours**

Defendant argues that Plaintiff billed over four hours for a response, which was a four page document regurgitating his previous motion. (See Doc. 175). As such, the court should award no more than 2 hours for the drafting of this document. The Court denies reduction of this entry.  The Court finds the billing to appropriate for the work done.

**C.  10/19/15 – 3.30 Hours**

Defendants argue that Plaintiff's counsel's entry includes "getting white board for trial." However, Defendant ignores that this time also includes travel to attend an interview of Tyrone Hutchins. The Court denies reduction of this entry.

**D.  Any Entries Related to Conferences with Sabree (Phillip Lyons)**

Defendants argue that there are various entries related to conferences with Sabree Lyons, which is indicative of double billing. For the reasons stated above, the Court denies reduction of this entry, finding that Plaintiff's counsel is entitled to recover fees for work done in collaboration with his legal assistant.

**E.  Billing Entries Made Before Appointment of Counsel 4/22/15 to 4/28/15 – 1.8 Hours**

The Court denies reduction of this entry.

**F.  Total Fees Granted**

Subtracting three hours for the November 6 entry, and applying the PLRA cap, the Court grants Plaintiff's Motion in the amount of $46,819.

This results from the following calculation:

--Travis N. Barrick: 178.4 hours x PLRA maximum rate of $190.5/hour = $33,985

--Mr. Lyons: 127.5 hours x $100/hour =                                    $12,750

--Gallian, Welker, & Beckstrom, LC: (postage & trial exhibit)              $84

                                                        **Total: $46,819**

## IV.    CONCLUSION

Based on the reasons stated above, the Court GRANTS in part and DENIES in part Defendants' motion for new trial. (ECF No. 221). The Court GRANTS remittitur of punitive damages against Defendant Rabourn from $1,000 to $50.  The Court GRANTS the remittitur of punitive damages against Defendant Connett as to the Equal Protection Claim in Count V from $2,200 to $50. The Court DENIES the remainder of the motion.

The Court further GRANTS in part and DENIES in part Plaintiff's motion for attorney fees consistent with its findings stated above. (ECF No. 200).


**DATED** this 17th day of October, 2017.


_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**